866 P.2d 1175

**In the Matter of the ADOPTION OF FRANCISCO A., Luis H., and Augustine V.,**

**and Concerning**

**Rita VEST, Plaintiff–Appellee/Cross–Appellant,**

v.

**STATE of New Mexico ex rel. NEW MEXICO HUMAN SERVICES DEPARTMENT, Defendant–Appellant/Cross–Appellee.**

**In the Matter of the ADOPTION PROCEEDINGS OF Robert RUNYON and Judith G. Runyon, to adopt minors.**

**In the Matter of the ADOPTION PROCEEDINGS OF Rita VEST, to adopt minors.**

No. 13358.

Court of Appeals of New Mexico.

Nov. 29, 1993.

Lorenzo Atencio, Familia Legal Services, Espanola, for plaintiff-appellee, cross-appellant.

Richard A. Griscom, Gen. Counsel, Judith A. Ferrell, Asst. Gen. Counsel, Human Services Dept., Santa Fe, for defendant-appellant, cross-appellee.

Thomas J. Cruse, Los Alamos, for Runyons.

Judith Mellow, Santa Fe, guardian ad litem.

## OPINION

APODACA, Judge.

The parties' respective motions for rehearing having been granted, and oral argument having been scheduled and heard, the opinion filed on May 11, 1993 is withdrawn, and the following opinion is substituted in its place.

These appeals arise from adoption proceedings involving three minor children. In a consolidated hearing, the children's court heard two conflicting petitions for adoption. The children's court granted the adoption petition of Judith and Robert Runyon (Runyons), but awarded visitation rights to Rita Vest (Vest), who was the other petitioner and the children's former foster parent. In their consolidated appeal, the New Mexico Human Services Department (HSD) and the Runyons (collectively referred to as HSD) raise the following issues: whether the children's court had jurisdiction to (1) consider Vest's petition for adoption or (2) grant visitation rights to Vest. Vest, in her appeal, raises the issues of whether (1) the children's court had jurisdiction to grant the Runyons' petition before HSD had formally terminated Vest's foster-parent rights pursuant to statute, and (2) HSD and the children's court denied her due process in rejecting her adoption petition. Although we hold that the children's court had jurisdiction to consider Vest's petition and we therefore reject HSD's and the Runyons' challenge to the award of visitation rights to Vest on that basis, we hold that, on the record before us, the grant of visitation rights to Vest was not supported by sufficient evidence. We also hold that Vest was not denied due process and that the children's court properly granted the Runyons' adoption petition. We therefore affirm in part and reverse in part.

## BACKGROUND

HSD has had legal custody of the three children, Francisco A., Luis H., and Augustine V., since May 1985. Beginning at about that time, Vest and her spouse were the children's foster parents. In 1986, the Vests expressed an interest in adopting the children and began the necessary adoption procedure. An August 1986 report on the Vests' suitability as adoptive parents was favorable. However, HSD was unable to terminate the biological parents' rights until April 1988. Vest's spouse had died in March 1988, but Vest carried on the adoption proceedings in her own behalf. She also continued as the children's sole foster parent until December 1988, when HSD removed them from her home and placed them with the Runyons.

Before HSD removed the children from Vest's home, she filed an appeal with HSD challenging its decision to remove the children. She also sought review of HSD's determination not to proceed with her adoption of the children. Although HSD did not hold a hearing before removing the children, in June 1989 the agency affirmed its decision to remove the children and to deny Vest's adoption petition. Immediately afterwards, the Runyons filed a petition for adoption of the

children in Sandoval County. Vest answered and HSD entered an appearance. The court allowed HSD to intervene and transferred the matter to the children's court in Santa Fe County. Meanwhile, Vest filed an action in Rio Arriba County requesting the children's court to review HSD's decision to deny her request to adopt the children. She also filed her own adoption petition in Rio Arriba County. The Runyons answered this petition. In December 1989 the parties filed a stipulated motion to consolidate these proceedings in Santa Fe County.

The court hearing commenced in October 1990. After the parties presented their cases, the children's court interviewed the children in camera. They expressed their desire to stay with the Runyons but also to visit with Vest. The court issued its intended decision in January 1991, but the parties filed pleadings contesting the decision. Final judgment was entered in July 1991.

In its decision and judgment, the children's court granted the Runyons' adoption petition. The court denied Vest's petition to adopt the children, but awarded her visitation rights. HSD appeals this decision, arguing that the children's court had no jurisdiction to consider Vest's petition or to award her visitation rights. Vest cross-appeals, arguing that the children's court had no jurisdiction to grant the Runyons' petition before HSD formally terminated Vest's foster-parent rights under the pertinent statute. She also argues that HSD and the children's court denied her due process in rejecting her petition for adoption.

## HSD'S APPEAL

### A. Jurisdiction.

■ In arguing that the children's court had no jurisdiction to consider Vest's adoption petition, HSD relies on NMSA 1978, Section 40–7–34(A) (Repl.Pamp.1989). This statute provides that, except for certain circumstances that do not apply here, the court may award adoption only to a petitioner or petitioners with whom HSD or another licensed adoption agency has placed the children. Id. HSD argues that, because the agency placed the children with the Runyons, the court had only two options, either to deny or to grant the Runyons' adoption petition. Id.; see also NMSA 1978, § 40–7–30(N)

(Repl.Pamp.1989) (defining placement as the process of selecting potential parents and physically transferring adoptee children to the potential parents).

In response, Vest contends that this jurisdictional argument is moot. She also argues that, while Section 40–7–34(A) dictates to whom the court may award adoption, nothing in that section dictates who may file a petition. HSD's reading of the statute, Vest claims, effectively means that HSD has absolute power over who may adopt children by having the power to place them with families. Finally, Vest argues that, no matter what the statutes provide, HSD's decision to prefer the Runyons as adoptive parents is reviewable for constitutional infirmity.

We agree that there is nothing in Section 40–7–34(A) suggesting a limitation on the children's court's jurisdiction. Section 40–7–34(A) is merely a statute that limits the court's power to grant a petition for adoption. If a party cannot prove the facts necessary, then the statute is of no value to that party. Specifically, unless Vest could plead and prove that HSD placed the children with her for adoption, she was not entitled to the right of adoption Section 40–7–34(A) provides. We need not determine whether the children were placed with Vest for adoption because Vest concedes that she could not have established placement for purposes of Section 40–7–34(A). Nevertheless, HSD's characterization of the children's court's consideration of Vest's petition as beyond the court's jurisdiction is without merit. See Sundance Mechanical & Util. Corp. v. Atlas, 109 N.M. 683, 687, 789 P.2d 1250, 1254 (1990). Vest merely failed to state a claim for adoption for which the court could grant relief. See SCRA 1986, 1–012(B)(6) (Repl. 1992). Thus, the children's court had jurisdiction to consider the petition, even though the petition was dismissible on the merits.

### B. Visitation.

In support of its contention that Vest should not have visitation rights, HSD focuses on the policy that adoption starts a family anew with all the rights and responsibilities of a biological family. See In re Estate of

*Holt*, 95 N.M. 412, 622 P.2d 1032 (1981). The Runyons' adoption of the three children created a new family. Thus, HSD argues, that family should have all the rights of any other family, including the right to determine who should and should not see the family's children regardless of claimed psychological ties with the children. Vest argues that the adoption statutes grant courts an inherent equitable power to award visitation, based on the statutory policy of protecting the best interests of adopted children.

A review of the case law on adoption, custody, and visitation rights reveals cases that assist in disposing of the issue before us, although there appears to be little uniformity in the case law and there is support for both parties' positions. *See* Danny R. Veilleux, Annotation, *Postadoption Visitation by Natural Parent*, 78 A.L.R. 4th 218 (1990); Annotation, *Visitation Rights of Persons Other Than Natural Parents or Grandparents*, 1 A.L.R. 4th 1270 (1980). There are various arguments against allowing third-party visitation following a child's adoption. Many courts have reasoned that adoption severs the ties of old relationships and granting visitation to third parties or enforcing such agreements would interfere with the new family. *See, e.g., Ex parte Bronstein*, 434 So.2d 780 (Ala.1983); *In re Adoption of Hammer*, 15 Ariz.App. 196, 487 P.2d 417 (1971); *Sachs v. Walzer*, 242 Ga. 742, 251 S.E.2d 302 (1978); *Browning v. Tarwater*, 215 Kan. 501, 524 P.2d 1135 (1974). Some courts have not allowed such visitation because they considered it against public policy, *see Hill v. Moorman*, 525 So.2d 681 (La.Ct. App.1988), or because it would deter adoptions, *see People ex rel. Levine v. Rado*, 54 Misc.2d 843, 283 N.Y.S.2d 483 (Sup.Ct.1967).

However, it appears the trend has been to consider or allow visitation to other persons who have been important to a child in a variety of situations, if visitation would be in the best interests of the child. For example, the right of stepparents who are neither biologically nor legally related to their step-children to seek visitation with the children upon divorce from the children's natural parents has been recognized. *See Carter v. Brodrick*, 644 P.2d 850 (Alaska 1982); *Bryan*

*v. Bryan*, 132 Ariz. 353, 645 P.2d 1267 (Ct. App.1982); *Wills v. Wills*, 399 So.2d 1130 (Fla.Dist.Ct.App.1981); *Collins v. Gilbreath*, 403 N.E.2d 921 (Ind.Ct.App.1980); *Simpson v. Simpson*, 586 S.W.2d 33 (Ky.1979); *Looper v. McManus*, 581 P.2d 487 (Okla.Ct.App. 1978); *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977); *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978). Some courts have allowed grandparents to obtain visitation rights with their grandchildren following the children's adoption by stepparents. *See, e.g., Reeves v. Bailey*, 53 Cal.App.3d 1019, 126 Cal.Rptr. 51 (1975); *Lingwall v. Hoener*, 124 Ill.App.3d 986, 80 Ill.Dec. 265, 464 N.E.2d 1248 (1984), *aff'd*, 108 Ill.2d 206, 91 Ill.Dec. 166, 483 N.E.2d 512 (1985); *Layton v. Foster*, 61 N.Y.2d 747, 472 N.Y.S.2d 916, 460 N.E.2d 1351 (1984). Nevada has held that it is within a trial court's equitable powers to grant an adoption decree conditioned on a stepgrandparent's right to seek visitation following the child's adoption by third parties. *Morse v. Daly*, 101 Nev. 320, 704 P.2d 1087 (1985).

When granting custody to a natural parent, some courts, having rejected the argument that the court may grant visitation rights only to persons specifically authorized by law to receive them, have granted visitation rights to nonparents. *See Rogers v. Trent*, 594 A.2d 32 (Del.1991); *Recknagel v. Roberts*, 465 So.2d 844 (La.Ct.App.), *cert. denied*, 468 So.2d 570, and *cert. denied*, 468 So.2d 579 (La.1985); *Evans v. Evans*, 302 Md. 334, 488 A.2d 157 (1985); *Seger v. Seger*, 377 Pa.Super. 391, 547 A.2d 424 (1988); *In re Custody of D.M.M.*, 137 Wis.2d 375, 404 N.W.2d 530 (1987). Some courts have recognized that, in certain circumstances, it may be in the child's best interests to continue contact with his or her former family and have accordingly held that it is not against public policy to enforce agreements for post-adoption visitation rights even when the child was adopted by persons other than biological relatives or stepparents. *See Michaud v. Wawruck*, 209 Conn. 407, 551 A.2d 738 (1988). Massachusetts has recognized that, where parental rights are terminated without the parents' consent, lower courts could permit post-adoption visitation by the natural parents if it was in the child's best interests.

*See In re Petition of Dep't of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 467 N.E.2d 861, 866 (1984).

In New Mexico, there is a strong tradition of protecting a child's best interests in a variety of circumstances. For example, this court has ruled that, if custody with someone whose sexual orientation may not meet with mainstream approval serves a child's best interest, then awarding that person custody of the child is appropriate. *In re Jacinta M.,* 107 N.M. 769, 772, 764 P.2d 1327, 1330 (Ct. App.1988). We have ruled similarly when custody was awarded to a mother who had remarried in a manner that violated the public policy of New Mexico. *Leszinske v. Poole,* 110 N.M. 663, 666–67, 798 P.2d 1049, 1052–53 (Ct.App.) (affirming award of custody to mother who married her maternal uncle), *cert. denied,* 110 N.M. 533, 797 P.2d 983 (1990). Even when the custodial parent did not reside with the child, we have affirmed a children's court ruling that granted that parent physical custody. *See Brito v. Brito,* 110 N.M. 276, 794 P.2d 1205 (Ct.App.1990) (affirming grant of custody to father although child resided with aunt). We have been no less cognizant of the overriding nature of children's best interests when visitation in the context of lifestyles that do not meet with mainstream approval was the issue. *See A.C. v. C.B.,* 113 N.M. 581, 829 P.2d 660 (Ct.App.) (agreement that psychological parent has a right to visit with child of biological parent not repugnant to public policy even though parents were formerly in a sexually nontraditional relationship), *cert. denied,* 113 N.M. 449, 827 P.2d 837 (1992).

Additionally, in *Christian Placement Service, New Mexico Christian Children's Home v. Gordon,* 102 N.M. 465, 697 P.2d 148 (Ct.App.1985), a case with circumstances analogous to this one, we held that the lower court properly denied a grandparent intervention as of right and permissive intervention in an adoption proceeding. She relied solely upon her status as biological grandmother to the child to demonstrate a tie to the child. We stated that this was insufficient for intervention, but recognized nonetheless that "[t]here are situations where it might be in the best interests of the child to allow intervention." *Id.* at 472, 697 P.2d at 155. The grandmother in that case sought intervention to obtain custody of the child. That intervention was as intrusive on the adoption process as Vest's efforts to seek adoption or visitation rights. *Gordon* implies that the best interests of the child would have prevailed and the grandmother would have been allowed to intervene had there been facts to support her position.

"The courts [in New Mexico] have consistently recognized that the state is parens patriae and the child's welfare and best interests are the paramount consideration for the court in custody cases." *Rhinehart v. Nowlin,* 111 N.M. 319, 325, 805 P.2d 88, 94 (Ct. App.1990). In that case, we recognized that, in certain situations, it may be in the child's best interest to allow visitation by a stepparent who had not adopted the child following divorce from the child's natural parent. *Id.* at 325, 805 P.2d at 94. As Vest points out, the adoption itself must be in the child's best interests. *See* NMSA 1978, § 40–7–51(C) (Repl.Pamp.1989).

Additionally, this Court has recognized that, when dealing with children, the district court is exercising its equitable powers. *See In re Guardianship Petition of Lupe C.,* 112 N.M. 116, 119, 812 P.2d 365, 368 (Ct.App. 1991) (stating that "our supreme court has held that the district court sitting as a court of equity has inherent power concerning issues of custody of minors," and citing *In re Santillanes,* 47 N.M. 140, 138 P.2d 503 (1943)); *In re Adoption of Doe,* 101 N.M. 34, 37, 677 P.2d 1070, 1073 (Ct.App.), *cert. denied,* 101 N.M. 11, 677 P.2d 624 (1984) (although adoption is a special statutory proceeding, trial court retains some equitable powers); *see also* 4 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1305 (Spencer W. Symons ed., 5th ed. 1941) [Pomeroy]. The touchstone of equity is that it is flexible; " 'the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' " *Navajo Academy, Inc. v. Navajo United Methodist Mission Sch., Inc.,* 109 N.M. 324, 329, 785 P.2d 235, 240 (1990) (quoting 1 Pomeroy § 109).

"[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' Brown v. Swann, 10 Pet. 497, 503 [9 L.Ed. 508]."

Weinberger v. Romero–Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)).

■ The Adoption Act, NMSA 1978, §§ 40–7–29 to –65 (Repl.Pamp.1989), neither specifically authorizes nor specifically forbids an adoption decree incorporating visitation rights for nonrelatives. Section 40–7–52 does not limit the children's court's authority to fashion a decree that is in the child's best interests and that includes, if appropriate, visitation rights for third parties with whom the child has close ties. The primary purpose of that statute is to ensure that adopted children can inherit from their adoptive parents. See Hahn v. Sorgen, 50 N.M. 83, 171 P.2d 308 (1946) (discussing legislative history of predecessor to Section 40–7–52). The Adoption Act also does not contain a statement of factors that should be considered when determining the best interests of a child. However, NMSA 1978, Section 40–4–9 (Repl.Pamp.1989), directs a court, when determining custody of a child, to consider all relevant factors, including the child's wishes and the child's relationship with "any other person who may significantly affect the child's best interest." Section 40–4–9(A)(3). There is no reason why a court may not consider similar factors when fashioning an adoption decree.

As one court has pointed out:

Traditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parents, stepparents, adoptive parents and grandparents. We are not prepared to assume that

the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development.

Michaud, 551 A.2d at 742 (citations omitted). For this reason, it is important for the children's court to maintain maximum flexibility in fashioning a decree that is in the child's best interests so that the child may maintain contact with other persons who have filled a parental role in his or her life. See Looper, 581 P.2d at 488–89; Seger, 547 A.2d at 427; see also Katharine T. Bartlett, Rethinking Parenthood as an Exclusive Status: The Need for Legal Alternatives When the Premise of the Nuclear Family Has Failed, 70 Va.L.Rev. 879, 902–11 (1984).

■ Although granting visitation to a nonparent does affect a parent's custody rights, this is not sufficient reason to apply a blanket rule against such decrees. It is well established in New Mexico that parents do not have absolute rights in their children; rather, parental rights are secondary to the best interests and welfare of the children. In re Samantha D., 106 N.M. 184, 186, 740 P.2d 1168, 1170 (Ct.App.1987). As one court has stated regarding visitation, "[t]his flexible device, when properly utilized within an adoption decree, not only can promote the best interests of the child but need not unduly impinge on the adoptive parents." Morse, 704 P.2d at 1091. If at some time the visitation is no longer in the child's best interests, the court may reconsider it. See Rhinehart, 111 N.M. at 329, 805 P.2d at 98; Weinschel v. Strople, 56 Md.App. 252, 466 A.2d 1301, 1306 (1983). However, because granting visitation rights does infringe on a parent's custody, it is appropriate to limit this decision to situations such as this where the party seeking visitation has acted in a custodial or parental capacity. See, e.g., Carter, 644 P.2d at 855 n. 5; Collins, 403 N.E.2d at 923–24. This will prevent visitation rights being granted to any person who happens to feel affection for a child.

■ In this case, the children's court believed that the Runyons, as well as Vest, would be fit parents. The difficulty, of course, was that the court could not award adoption to all three petitioners. Thus, the

court did what it could to serve the children's best interests in considering their stated desire to spend time with Vest.[1] However, as the parties agreed at oral argument, the only evidence supporting the visitation order was the children's preference. There is a much wider array of considerations the trial court must undertake in considering the grant of visitation rights. For example, the children's court must carefully consider how visitation will affect the adoption. *See generally People ex rel. Wilder v. Spence–Chapin Servs. to Families & Children*, 93 Misc.2d 617, 403 N.Y.S.2d 454, 455 (Sup.Ct.1978) (visitation denied because it would subject child to ongoing bitter dispute between party seeking visitation and adoptive parents); *Reeves*, 126 Cal.Rptr. at 56 (visitation allowed because party seeking visitation would not disrupt the adoptive child's new family relations).

When the issue of visitation in connection with an adoption confronts a children's court, the court should undertake a careful study of all the parties involved and all the relevant circumstances. Vest stressed at oral argument that she tried to persuade the children's court to appoint an expert for a comparative study, but, although expert insight into the issue of visitation may be valuable, expert evidence on a visitation issue is not required. *Cf.* NMSA 1978, §§ 32A–5–3(I) & 32A–5–14 (Repl.Pamp.1993) (requiring that adoption pre-placement study

be done by investigator "certified" to conduct such studies). It is evident that the children's court consideration of the children's wishes alone was the result of a misunderstanding of the necessary scope of the inquiry. For this reason, I agree that, on this record, insufficient evidence supports the award of visitation to Vest, and we must reverse.[2]

## VEST'S CROSS–APPEAL

### A. Failure to Properly Terminate Foster–Parent Rights.

Initially, Vest argues that she had a constitutional or statutory expectation of continued foster care of the children. In this connection, she contends that HSD agreed to give her a hearing before taking the children away from her and that the law must recognize this expectation interest and protect it by not allowing other parties to adopt the children before the foster-parent relationship has been formally terminated. We assume for the sake of discussion that this expectation interest is legally significant. *See Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 847, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977) (assuming without deciding that foster parents have liberty interest in continued relations with foster children). From our reading of Vest's briefs, we view her argument to be that the hearing HSD provided (on the deci-

---

1. In her response to the respective motions for rehearing, the guardian ad litem referred us to the Biblical passage in 1 Kings 3:16 to 3:28. The quoted story recounts King Solomon's threat to cut a child in half with his sword in order to divide the child between two women who each claimed the child as her own. Responding to the threat, one woman pled with the king to spare the child and give it to the other woman, while the other woman insisted that the child be killed so that neither woman could have him. The use of such artifice to reveal the identity of the child's mother is said to have shown to others the wisdom emanating from God that Solomon possessed. This passage is cited by the guardian ad litem as "precedent" for denying Vest's visitation in this appeal. Considering the Runyons' statement in their own motion for rehearing that they would withdraw their adoption petition if this Court eventually affirmed the grant of visitation rights to Vest, I find the quoted passage to be possible support for granting Vest visitation rights, rather than for denying them.

2. My preference would be to remand to the children's court for further findings on the issue of visitation. *See State ex rel. Human Servs. Dep't v. Coleman*, 104 N.M. 500, 505, 723 P.2d 971, 976 (Ct.App.1986). As already noted, the children's court's inquiry into this issue was too limited in scope. Additionally, there has been a significant lapse of time since the children's court's determination. This appellate delay may have had a crucial effect on the issues before the children's court. *See generally State ex rel. Juvenile Dep't v. Geist*, 310 Or. 176, 796 P.2d 1193, 1200–01 (1990) (recognizing that protracted litigation regarding parental rights is detrimental to children). Because the paramount concern here is the children's best interests, I believe it would be prudent for the children's court to consider the present circumstances in determining if visitation with Vest and adoption by the Runyons would be in the best interests of the children. Because the other panel members do not agree with this remedy, however, the grant of visitation rights is reversed without remand.

sion to remove the children) was inadequate and not timely.

■ First, we find nothing in the brief in chief or reply brief on cross-appeal that directly supports the argument that HSD had to formally terminate Vest's rights as a foster parent before placing the children with other potential adoptive parents. Because Vest cites no authority, we assume there is none. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984).

■ Second, regarding the allegation that HSD agreed to provide Vest with a hearing before removal of the children, prior to briefing nothing in the record supported the claim. By motion, Vest requested that we permit her to supplement the record with copies of the foster-care agreements that apparently were exhibits below. She filed the motion after HSD filed its answer brief on cross-appeal, much later than the time allowed under SCRA 1986, 12–212(A) (Repl. 1992). *But see* SCRA 12–212(C) (allowing appellate court on motion of party and for good cause shown to order that additional exhibits be forwarded to appellate court). Vest contends that she did not designate the exhibit for appeal out of concerns for judicial economy. HSD responds that this is an attempt to excuse Vest's failure to assure a proper record for review. We agree that Vest's efforts are very late, but nevertheless we are confronted in this appeal with the question of what is in the best interests of the children. We assess those interests to be weightier than the minimal loss of judicial efficiency that allowing consideration of the exhibits might cause. Having concluded that there is "good cause" to order inclusion of the exhibits into the record, we granted Vest's motion and directed that the exhibits be forwarded to this Court.

■ Having now reviewed these exhibits, we determine that they do indeed reveal that HSD was to provide a pre-termination hearing to Vest if she requested one. Vest did request such a hearing, and HSD did apparently review its decision, although not until after the children were removed from Vest's home. Nonetheless, even if the late review prejudiced Vest's opportunity to adopt the children by allowing them to bond with the Runyons, we do not see how HSD's failure to provide an adequate hearing compelled the children's court to deny the Runyon's petition and grant Vest's. Although HSD's failure to give Vest a timely hearing is a factor the children's court could consider in determining whether to grant or deny the competing adoption petitions, the overriding goal of the children's court was to determine whether the adoption was in the best interests of the children, *see* § 40–7–51(A)(7), not to correct HSD's mistakes. We thus decline to reverse the children's court's decision granting the Runyons' adoption petition on this basis.

B. *Denial of Due Process by HSD.*

Vest argues that HSD denied her due process by failing to conduct the necessary studies of her suitability as an adoptive parent. Because of this failure, she argues, she never had an equal chance at being the adoptive parent. HSD counters, however, that the home study the statutes require is not HSD's responsibility, but rather the petitioner's responsibility. *See* §§ 40–7–40, –42(M), –46. We find no request for a home study by Vest in the record. Thus, there are no facts to support the argument that HSD denied Vest her right to a suitability study.

C. *Denial of Due Process by the Children's Court.*

Vest also argues the children's court denied her due process by not hearing the adoption petition until well after the children had time to bond with the Runyons. But for this bonding, she claims, the clear choice for the children's best interests would have been her adoption of them.

■ We will assume for the sake of argument that unreasonable delays in deciding an adoption petition could amount to a due process violation. Again, however, Vest cites no authority to support the notion that the children's court violated any time limitations. She refers to a sixty-day period after the child's placement within which a party must file a petition for adoption. *See* § 40–7–41. It appears, however, that Vest failed to raise in the children's court any contention that

the petition for adoption was untimely. Therefore, we will not consider this argument. *See* SCRA 1986, 12–216(A) (Repl. 1992). The remainder of the delays noted by Vest also do not suggest a violation of her rights. Some of the delay in bringing this case to final judgment was not attributable to the children's court or to the Runyons. Through misfortune, Vest was unable to testify on the date of the hearing. It took time for the court to meet with the children. There were also motions and discovery that preceded the hearing date, a reasonable expectation in a strongly contested case. After considering the record, we can discern no unreasonable delay in the court's reaching a difficult decision. If Vest had a due process right to a judgment on her adoption petition within a reasonable period of time, the children's court did not violate that right.

### D. *Failure to Comply with Section 40–7–34.*

■ Vest contends that the children's court lacked jurisdiction to grant the adoption because the requirements of Section 40–7–34 were not met. That section requires that an adoption petition not be granted unless the adoptee has been placed for the purpose of adoption in the home of the proposed adopting parents by HSD. That requirement was met in this case. The section also requires that an affidavit setting forth certain facts be filed with the petition. In this case, those facts were set forth in the petition itself, and the petition was verified by the Runyons. This constituted compliance with the statute. We therefore reject Vest's contentions predicated on Section 40–7–34.

## CONCLUSION

Because we hold that the children's court had jurisdiction to consider Vest's adoption petition, we reject HSD's challenge to the award of visitation rights to Vest on that basis. However, because the award of visitation rights was based solely on the children's preference, we determine that the record contains insufficient evidence to support the grant of visitation rights, and the children's court's order must therefore be reversed.

We also conclude that Vest was not denied due process by either HSD or the children's court. We thus affirm the children's court's decision granting the Runyons' adoption petition but reverse that part of the order granting visitation rights to Vest. The parties shall bear their own costs on appeal. *See* SCRA 1986, 12–403(A) (Repl.1992).

**IT IS SO ORDERED.**

MINZNER, C.J., and HARTZ, J., specially concur.

MINZNER, Chief Judge (specially concurring).

On motions for rehearing and following oral argument on the motions, I withdraw my prior opinion and substitute the following.

I concur in all of Judge Apodaca's opinion except the section entitled "Visitation." On the issue discussed in that section, I agree with Judge Apodaca that the district court has some equitable power in adoption cases. Nevertheless, I do not think that the evidence supports an exercise of equitable power to award Vest visitation rights, and I agree with Judge Hartz that the portion of the district court's judgment ordering visitation with Rita Vest should be reversed. Under the circumstances of this case, I do not think it is necessary to determine the scope of the district court's equitable power to grant visitation in an adoption proceeding. Therefore, I concur specially in the section entitled "Visitation."

I am not persuaded that the general principle expressed in NMSA 1978, Section 40–7–52 (Repl.Pamp.1989) is an absolute barrier to an award of visitation rights. The parties opposing visitation rights in Vest rely on language in Section 40–7–52 that "the child and the petitioner shall sustain the legal relation of parent and child as if the adoptee were the biological child of the petitioner." I am not as sure what this language means as the parties opposing the visitation rights awarded to Vest seem to be. I think Judge Apodaca is right to suggest that the legislature probably contemplated establishing rights of inheritance by, from, and through adoptive parents and eliminating such rights by, from, and through biological parents.

*See Hahn v. Sorgen*, 50 N.M. 83, 171 P.2d 308 (1946). I do not find what else the legislature intended clear.

In enacting Section 40–7–52 the legislature may have had in mind the "parental right" doctrine. *See Shorty v. Scott*, 87 N.M. 490, 493, 535 P.2d 1341, 1344 (1975). "This rule creates a presumption that the welfare and best interests of the minor child will best be served in the custody of the natural parents and casts the burden of proving the contrary on the non-parent." *Id.* Under that doctrine or rule, parents have a right to custody, but the right is not absolute.

As a matter of constitutional law, parents have a fundamental right to custody. *See In re Ronald A.*, 110 N.M. 454, 455, 797 P.2d 243, 244 (1990). Absent a finding of substantial harm, "the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit." *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn.1993) (decided under Tennessee constitution). The legislature might be viewed as having analogized the relationship of an adoptive parent and the adoptee to the relationship of a biological parent and child in order to protect the same constitutional right. Nevertheless, the right is not absolute. *See id.*

Further, in this case the question for the district court was whether to create the legal relationship. The legislature has directed that the court make that determination only after considering whether the adoption serves "the best interests of the adoptee." *See* NMSA 1978, § 40–7–51(A)(7) (Repl. Pamp.1989); *see also* § 40–7–51(C). In an exceptional case, adoption might serve the adoptee's best interests only if the status was conditioned on the adoptive parents' recognizing the adoptee's relationship with another person by agreeing to visitation rights in him or her. *See, e.g., Morse v. Daly*, 101 Nev. 320, 704 P.2d 1087 (1985).

We recognized in *A.C. v. C.B.*, 113 N.M. 581, 829 P.2d 660 (Ct.App.), *cert. denied*, 113 N.M. 449, 827 P.2d 837 (1992), a limitation on a biological parent's rights to custody of a child. We recognized in that case that an agreement to raise a child entered into between the child's biological mother and an-

other woman was not per se unenforceable. *Id.* at 584–87, 829 P.2d at 663–66. Further, both the Adoption Act, NMSA 1978, §§ 40–7–29 to –61 (Repl.Pamp.1989), and the Children's Code, NMSA 1978, §§ 32–1–1 to –59 (Repl.Pamp.1989), seem to authorize limitations on a biological parent's rights to custody. *See, e.g.*, § 40–7–49(D) (authorizing the court to determine "in the best interests of the adoptee, the person who shall have custody," if a consent or relinquishment by the adoptee's mother or father is held invalid); *see also* § 40–7–51(C) (authorizing the court, after denying a petition for adoption, to determine "in the best interests of the adoptee" who shall have custody of the child); *and* § 32–1–58 (providing for permanent guardianship of a child when the likelihood of a child being adopted is remote or it is established that termination of parental rights is not in the child's best interests; permanent guardianship grants guardian all rights and responsibilities of a parent, subject to rights of a natural or adoptive parent, if any, set forth in decree of permanent guardianship).

For these reasons, I believe that Section 40–7–52 provides this Court with uncertain direction on the issues discussed under "Visitation." Judge Hartz' analysis of the Grandparents Visitation Act. NMSA 1978, §§ 40–9–1 to –4 (Repl.Pamp.1989), is harder to answer. However, the parties have argued a lack of jurisdiction or authority under the Adoption Act, *see* § 40–7–29, and Judge Apodaca makes a persuasive case that under our case law the district court retains some equitable powers in exercising its powers under the Adoption Act. *See* N.M. Const. art. VI, § 13 (district court has original jurisdiction in all matters); *Durham v. Rasco*, 30 N.M. 16, 227 P. 599 (1924) (original equity jurisdiction is in district courts). Although I agree with Judge Hartz that the legislature still has the last word, I am not sure he is right that the legislature has spoken on this issue. Had our legislature been as explicit as the Nevada legislature, which has now provided within its Adoption Act a provision that "[t]he court may not grant a right to visit the child to any person other than as specified . . . ," *see* Nev.Rev.Stat.Ann. § 127.171(2) (Michie 1993), our task and that of the dis-

trict court would have been easier. But the New Mexico legislature has not been that explicit.

Rather, in the Grandparents Visitation Act, the legislature has provided for visitation rights in grandparents and has also provided that those rights apply to certain statutory adoption proceedings. The legislature has provided clear authority for the district court to grant such rights in situations that lie within the terms of the statute. Thus, in the Grandparents Visitation Act, the legislature has provided grandparents a clear basis on which to petition and specific directions on how a district court is to review the petition. I am not persuaded that on particular facts, in a unique case, the legislature meant to foreclose a district court from determining that post-adoption visitation rights were appropriate in circumstances not specifically provided for in either the Grandparents Visitation Act or the Adoption Act. The Grandparents Visitation Act does not by its terms foreclose visitation rights in persons other than grandparents nor does it specifically provide, as does the Nevada statute, that there is no power or authority to grant visitation rights in statutory adoption proceedings other than those specifically mentioned. Judge Hartz concludes that the legislature's intent is clear. Although I agree that what the legislature intended to authorize is clearly stated, I am not convinced that the legislature intended to forbid a district court from proceeding in a child's best interests in an appropriate case. I do not believe that the difference between expressly precluding a court from acting and expressly authorizing a court to act is irrelevant, and I am reluctant to infer a restriction on a district court's jurisdiction or power to act in a child's best interests.

Thus, I agree with Judge Apodaca that the district court has some equitable power in adoption cases. Nevertheless, I do not think that the evidence adduced, as reflected by the record, supports an exercise of equitable power to award Vest visitation rights. In coming to this position, I am influenced by several factors.

The first factor is that there is little evidence to support a finding that a general order awarding reasonable visitation rights is in the children's best interests. *See* Judge Hartz' opinion, at 1188–1189 n. 2. In fact, the findings entered by the district court provide a much more limited view of what it was prepared to authorize than the final judgment suggests. The district court, for example, repeatedly emphasizes the boys' wishes and seems to me to limit what is being ordered to visitation rights as *they* wish. *Cf. In re Adoption of Children by F.*, 170 N.J.Super. 419, 406 A.2d 986 (1979) (preserving visitation with natural father at daughters' election). Thus, I think we lack the kind of findings that would support a conclusion that this case was an appropriate exercise of any equitable powers that exist in a district court under the Adoption Act. I think what moved the district court was HSD's conduct in removing the boys from Vest when and as it did. I agree with the guardian ad litem that the children's best interests at the time the judgment of adoption was entered must be controlling. The findings do not clearly establish that visitation rights were in the boys' best interests at that time.

The second factor is that Vest never requested visitation, but rather sought adoptive parent status for herself. Competing petitions for adoption were filed, and as the guardian ad litem points out in her response to Vest's motion for rehearing, Vest continues to press the merits of her own petition for adoption. Thus, I am not certain how visitation rights will work. This situation seems potentially more disruptive than natural parents retaining visitation rights after termination of other rights or grandparents seeking visitation rights with a grandchild adopted by a stepparent, which are the more common situations in which other courts have acted without express statutory language.

Finally, Vest seems to premise her right to visitation, as she does her right to adoptive status, on a status as "psychological parent." I find that argument very appealing. However, Vest offered findings to the effect that she had become a "psychological parent" as a result of the bonding that occurred during foster care, which the district court rejected.

I think this means that the court found against Vest and rejected her premise.

At oral argument on the motion for rehearing, Vest argued that the authority to grant the adoption petition she filed provided a basis for awarding her visitation rights, but as Judge Apodaca's opinion indicates, Vest failed to state a claim for adoption for which the court could grant relief. We cannot find authority to grant visitation rights solely from the court's jurisdiction to entertain the adoption petition. The statute specifically requires consideration of the child's best interests in awarding custody if an adoption petition is denied. See § 40-7-51(C). It would be illogical to require less of a showing to authorize visitation rights when a petition to adopt has been granted to another party.

Vest also argued at the oral argument on the motions for rehearing that the district court did not reject her findings regarding her status as a psychological parent. Her counsel referred us to the district court's decision letter. I respect counsel's advocacy, but I do not believe that the decision letter supports the argument.

The district court's letter indicates "[t]he actions of the New Mexico Human Service Department in connection with this adoption have shocked the Court." The court expresses regret that in not giving the children to Vest it must "deprive her of the joy she should be entitled to for providing for these children when they needed it most." The court also states that "[t]he best interests of the children are best served if the children's lives are not disrupted any further." I view the letter as supporting the decision to grant the Runyons' petition to adopt. It does not seem to me to support Vest's argument that she was a psychological parent.

In summary, I think the district court should be reversed, not for lack of jurisdiction or specific statutory authority, but for lack of findings to support the only basis Vest offered to support the award. We probably did not need to decide all of the more difficult issues raised under the heading "Visitation," but in view of the importance of these issues, I do not think it is inappropriate to resolve those issues upon which two of us agree. Thus, I concur in all of Judge Apodaca's opinion except the section entitled "Visitation." Because I agree with Judge Apodaca that the district court retains some equitable powers to award visitation under the Adoption Act, and because I agree that there is no basis in this record to affirm the district court's decision granting visitation rights to Vest, I specially concur.

HARTZ, Judge (specially concurring).

## I. INTRODUCTION

I concur in the result and join in all of Judge Apodaca's lead opinion except the section entitled "Visitation." In my view the district court had no authority to order visitation, regardless of the evidence relating to the best interests of the children.

The order granting visitation rights to Vest may well be unprecedented in the United States. The parties have not directed us to any published decision—nor have I found one—that imposes a visitation order on adoptive parents when an agency placed the child for adoption with strangers to the person seeking visitation and no contract committed the adoptive parents to permit post-adoption visitation. The overwhelming weight of authority from other jurisdictions supports reversal of the Vest visitation order.

More importantly, the district court's order is not authorized by any New Mexico statute and is contrary to clear legislative policy expressed in New Mexico adoption and visitation statutes. If there exists any inherent equitable power to order post-adoption visitation, which is highly doubtful, that power cannot prevail over contrary legislative intent.

### A. Policy Implications

Although resolution of the present case does not require this Court to make any policy judgments regarding post-adoption visitation, a brief outline of the important policy considerations will facilitate discussion of the pertinent legal authority. If one ignores these policy considerations in analyzing court decisions and statutes pertaining to visitation, one can fail to distinguish distinguishable authorities and thereby acquire a quite distorted view regarding the impact of

the authorities and what the trends are. The policy considerations are: (1) Is post-adoption visitation in the child's best interests? (2) Who should decide whether visitation is in the child's best interests—the state (through the judiciary) or the adoptive parents? and (3) Will adoption be discouraged if the state can order post-adoption visitation?

As for the first consideration, not all courts are as sanguine as the other members of this panel about the value of post-adoption visitation. The Ohio Supreme Court recently opined that "even where adoptive parents consent to visitation by biological relatives whom they do not know, such an arrangement is bound to be stressful for the child, particularly where the parties are not favorably disposed toward one another." *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055, 1063 (1991). A California appellate court has discussed the matter at greater length in a case not involving adoption.

> Providing parents a superior ability to influence the upbringing of their child is clearly in the interests of the child. By diminishing the likelihood of struggle between parents and others close to the child with whom the parents are at cross-purposes, the parental preference minimizes the likelihood the child will be exposed to hostility between those with whom he or she has a strong attachment, which can cause distress, create loyalty dilemmas and be disruptive of the child's socialization experiences. (Emery, *Marriage, Divorce and Children* (1988) at pp. 94–98, and other authorities there cited and discussed.) Recent empirical studies suggest that in many instances sustained exposure to ongoing conflict may cause children more psychological distress and adjustment difficulties than separation from an attachment

figure involved in the conflict. (See Johnston, Kline & Tschann, *On–Going PostDivorce Conflict: Effects on Children of Joint Custody and Frequent Access*, 59 Am.J. of Orthopsychiatry 576 (1989).) Deference to parental autonomy not only minimizes conflict with others outside the immediate family, but encourages the development of a stronger and more reliable relationship between parent and child. "A child develops best if he can have complete trust that the adults who are responsible for him are the arbiters of his care and control as he moves toward the full independence of adulthood and gradually comes to rely upon himself as his own caretaker." (Goldstein, Freud & Solnit, *Beyond the Best Interests of the Child* (1979) at pp. 117–118.)

*In re Marriage of Gayden*, 229 Cal.App.3d 1510, 280 Cal.Rptr. 862, 865 (1991) (footnote deleted) (denying visitation to divorced father's former girlfriend); *see Bikos v. Nobliski*, 88 Mich.App. 157, 276 N.W.2d 541, 545 n. 6 (1979); *Petition of Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376, 419 N.E.2d 285, 287 n. 5 (1981).

I detect no consensus, even an emerging one, that court-ordered visitation may be in the best interests of a child after adoption by two strangers to the person seeking visitation (ordinarily a member of the child's biological family). It would be helpful to have scientific studies in this country specifically directed to this arrangement, but the absence of reported decisions indicates that it has been rare, if not unknown, for adoptive parents who are strangers to the two natural parents to be ordered by courts to permit visitation.[1] As the other members of the panel concede, there is hardly compelling evidence in this case that visitation by Vest is in the best interests of the children.[2]

---

**1.** There would, however, be significant value in studying what happens when a court enforces a pre-adoption agreement to permit post-adoption visitation, as in *Michaud v. Wawruck*, 209 Conn. 407, 551 A.2d 738 (1988).

**2.** The record reflects the following: In an in camera interview with the trial judge, the children answered yes to the questions (1) "If I set it up, would you like to go visit with Mrs. Vest?" (2) "Would you like to see her and see how she's

doing?" and (3) "Would you guys like to go to Kansas and visit with her for a couple of days?" The guardian ad litem said that she would not object to visitation, that she believed that visitation would "do the children no harm," and that such visits may be in the children's interests. There was no testimony by social workers or other experts regarding whether visitation with Vest would be in the children's best interests. On the contrary, the social worker who had handled the case longer than anyone else said

Regarding the second policy consideration implicated by the Vest visitation order, the lead opinion rejects the view that the new parents, rather than the state, should determine what is in the children's best interests. Again, I detect no judicial consensus in support of the majority's position. If anything, the consensus is against state interference when the new parents are strangers to the person seeking visitation. An Illinois appellate court has written:

> We wonder, however, whether it is wise for courts of law to attempt to impose their own concepts of "best interests" upon appropriate, competent and loving adoptive parents, who, themselves, have the best interests of the child at heart.... [A]doptive parents may allow anyone to have visitation, even if the persons seeking visitation are not entitled to have visitation rights enforced. Perhaps at some point we must trust in the adoptive parents to do what is in the best interest of the adopted child.

*In re M.M.*, 226 Ill.App.3d 202, 168 Ill.Dec. 287, 295, 589 N.E.2d 687, 695 (1992), *aff'd*, 156 Ill.2d 53, 189 Ill.Dec. 1, 619 N.E.2d 702 (1993); *see Huffman v. Grob*, 172 Cal.App.3d 1153, 218 Cal.Rptr. 659, 661 (1985) ("The purpose of the laws severing old family ties after adoption is to permit the new, adoptive family ties to solidify and to confer upon the new parent(s) discretion to provide for the best interests of the adopted child without interference from the former relatives."); *L.F.M. v. Department of Social Servs.*, 67 Md.App. 379, 507 A.2d 1151, 1160 (1986) ("There must be a point, however, where adoptive parents are presumed, like natural parents, to be acting in their children's best interests without having to prove it in a court of law."); *Aegerter v. Thompson*, 610 S.W.2d 308, 310 (Mo.Ct.App.1980) ("The new parents are totally responsible for the child's welfare. They should also have the authority to determine what is best for the child."); *Developments in the Law, the Constitution and the Family*, 93 Harv.L.Rev. 1156, 1214 (1980) [hereinafter *Developments* ] (there is a "presumption that parents are better qualified than the state to promote the child's best interests"); *cf. Lihs ex rel. Lihs v. Lihs*, 504 N.W.2d 890, 892 (Iowa 1993) (government is ill-equipped to dictate details of interaction among family members, and ordering visitation coerces what should remain a moral obligation rather than a legal obligation). Indeed, constitutional concerns arise when a state orders fit parents to submit to visitation by third parties. *See Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993) (Grandparents' Visitation Act invaded parental privacy rights protected by state constitution).

The lead opinion mentions, but does not discuss, the third policy consideration—the possibility that adoptions will be discouraged if adoptive parents may be subjected to visitation orders. In other words, even if visitation in the particular case may improve the child's welfare, perhaps that improvement cannot be justified if the possibility of court-ordered visitation deprives other children of adoptive parents. Underlying the lead opinion may be (1) the view that the policy favoring adoption of parentless children must yield to the need to advance the best interests of children who manage to get adopted or (2) the view that the possibility of deterring potential adoptive parents is remote.

---

that the children had adjusted well to the initial separation from Vest and that he was concerned about Vest's ability as a foster parent even before the children were removed. The Runyons' attorney represented to the court that the psychologist for one of the children thought that visitation would not be in that child's best interests and that he did not believe that visitation would work. Apparently a letter by the judge indicating that he would order visitation caused the Runyons to consider withdrawing their petition for adoption. In court, however, Mrs. Runyon said that she and her husband were not opposed to having Vest visit the boys but that "We do feel that we would like to do that as total parents of these children, working it out [with Vest] rather than under a court order." At a later proceeding Mrs. Runyon responded that the visitation issue "seems to be getting out of hand" and the Runyons' attorney stated that the children had been receiving inappropriate letters from Vest. Mrs. Runyon brought to court one letter from Vest which was addressed to "My Precious Sons" and told the boys that she was their "true mom." The Runyons and the guardian ad litem also noted that Vest was sending religious material to the children. The judge responded that all future correspondence should be subject to his inspection and that any visitation would have to be court-supervised, although such restrictions do not appear in any court order in the record.

Other courts have rejected both views. The Illinois Supreme Court wrote:

[D]ifferent issues are involved in determining the best interest of the child in an adoption by strangers and in an adoption by a natural parent and a new spouse. In adoptions involving strangers, the primary policy concern has traditionally been with maximizing the pool of potential adoptive parents by guaranteeing, through the termination of the rights and responsibilities of the natural parents, that the adoptive parents will have "the opportunity to create a stable family relationship free from unnecessary intrusion."

*Lingwall v. Hoener*, 108 Ill.2d 206, 91 Ill.Dec. 166, 170, 483 N.E.2d 512, 516 (1985) (quoting *In re Roger B.*, 84 Ill.2d 323, 49 Ill.Dec. 731, 418 N.E.2d 751 (1981)). The Ohio Supreme Court said:

[W]e cannot hold that the state's interest in preserving the extended family [through grandparent visitation] overrides its interest in providing children, who would otherwise become wards of the state, with a permanent and stable home.... If preconditions are imposed on the adoptive parent-child relationship, or if adoptive parents are forced to agree to share parenting responsibilities with people whom they do not know, many potential adoptive parents will be deterred from adopting.

*In re Adoption of Ridenour*, 574 N.E.2d at 1063; *see In Interest of A.C.*, 428 N.W.2d 297, 302 (Iowa 1988); *cf. In re M.M.*, 168 Ill.Dec. at 203, 589 N.E.2d at 688 n. 1 (potential adoptive parents stated their belief that visitation order could "expose them to a[n] on-going potential for litigation, which could drain their very limited financial resources"). *But cf.* Carol Amadio & Stuart L. Deutsch, *Open Adoption: Allowing Adopted Children to "Stay in Touch" with Blood Relatives*, 22 J.Fam.L. 59, 59–60 (1983–84) (suggesting that permitting agreements providing for post-adoption visitation could encourage adoptions).

To summarize, more is at stake here than simply one judge's courtroom view of what is in a particular child's best interests. This case presents profound and difficult policy issues regarding the pros and cons of visitation; the power of the state to interfere with a fully functional, intact family; and the need to find adoptive parents for many unfortunate children.

Recognition of these policy issues can prevent an oversimplified analysis of this appeal. Distinctions must be made, and failure to make them can lead the court astray. In my view the majority has ignored distinctions that are of great importance in light of the above-discussed policy issues.

For example, it is inappropriate to rely on cases involving visitation in the context of a divorce when one is considering visitation after an adoption by strangers to the original family. One reason is that the "best interests" standard has a far different impact on parental rights in the context of a divorce than in the context of an adoption by strangers. In the divorce context, unlike the adoption context, application of the "best interests" standard ordinarily does not require a judicial determination that the child's best interests prevail over parental rights. A divorce dispute generally arises between two parents with equal parental rights. The divorce itself cuts in half the sum of the parental rights of the parents because only one parent at a time can exercise parental rights. Both parents' parental rights cannot be fully satisfied regardless of the court's decision on custody and visitation. The best interests of the child is an appropriate standard to decide between the desires of the two parents. Application of the "best interests" standard does not itself reduce the sum of the parental rights of the divorced couple, nor does it imply that a judge's view of the child's best interests prevails over parental rights. In contrast, adoptive parents ordinarily constitute an intact family unit, and any visitation order cannot help but reduce the sum of the parental rights of the adoptive parents. When a court orders visitation by third parties as in the child's best interests, the court is necessarily deciding that its view of the child's best interests prevails over parental rights.

A second reason to distinguish visitation in the divorce context from visitation in the adoption context is that only in the adoption context is there a need to consider how visi-

tation will affect the prospects of the child's obtaining parents.

### B. Authority in Other States

As a result of the failure to distinguish between distinguishable circumstances, the lead opinion errs when it relies on its perception that "the trend has been to consider or allow visitation to other persons who have been important to a child in a variety of situations, if visitation would be in the best interests of the child." There is some truth in the statement quoted, but the statement is misleading insofar as it suggests any legal support for ordering visitation in favor of Mrs. Vest. The pertinent authority is authority that specifically addresses visitation similar to the visitation ordered here. Hence, although there has been a trend in broadening rights of visitation—primarily to grandparents—one must recognize that legislatures and courts have almost unanimously drawn the line short of permitting visitation in the circumstances of this case. In the absence of a visitation agreement no authoritative decision has approved a visitation order when an adopted child was placed for adoption with a stranger to the person seeking visitation.

Other courts have observed that there is no precedent for a post-adoption order for grandparent visitation when the child has been placed for adoption with strangers. *See L.F.M.*, 507 A.2d at 1159; *In re Adoption of Ridenour*, 574 N.E.2d at 1062. That observation need not be restricted to visitation by grandparents. In particular, in jurisdictions that permit orders for post-adoption visitation by natural parents even in the absence of a prior visitation agreement,[3] there appears to be no reported decision affirming such an order when the adoptive parents are strangers to the biological family. A number of courts have explicitly drawn the distinction between "traditional" adoption (when visitation cannot be ordered) and adoption by a stepparent or other person known to the biological family (when visitation can be ordered). *See Reeves v. Bailey*, 53 Cal.App.3d 1019, 126 Cal.Rptr. 51, 56 (1975); *Huffman*, 218 Cal.Rptr. at 661–62; *In re Marriage of*

*Aragon*, 764 P.2d 419, 421 (Colo.Ct.App. 1988); *Hicks v. Enlow*, 764 S.W.2d 68, 73 (Ky.1989); *Lingwall*, 91 Ill.Dec. at 171, 483 N.E.2d at 517; *In Interest of A.C.*, 428 N.W.2d 297 (Iowa 1988); *L.F.M.*, 507 A.2d at 1159; *Preston v. Mercieri*, 133 N.H. 36, 573 A.2d 128, 134 (1990); *Mimkon v. Ford*, 66 N.J. 426, 332 A.2d 199, 203 (1975); *In re Adoption of Ridenour*, 574 N.E.2d at 1062; *Suroviec v. Mitchell*, 347 Pa.Super. 399, 500 A.2d 894, 896 (1985); *Chavis v. Witt*, 285 S.C. 77, 328 S.E.2d 74, 75 (1985). Evaluation of the policy concerns that I noted earlier—protecting the best interests of the child, recognizing the autonomy of adoptive parents, and encouraging people to adopt children—may differ substantially depending upon whether the adoptive parents are strangers to the natural parents or whether, say, the adoptive parent is married to a natural parent. For example, when a child needs to be placed for adoption, adoptive parents may find visitation by strangers to be a major intrusion on the autonomy of the adoptive family, and potential adoptive parents may be deterred from adoption because of the prospect of a visitation order, thus increasing the possibility that the child will not find a permanent home. In contrast, in a step-parent adoption, visitation by a former relative (such as an ex-spouse) is likely to be only a continuation of a prior intrusion, and the prospect of a visitation order will not affect the child's finding a permanent home because the child already has a permanent home with the custodial natural parent.

Statutes in other states also reflect a policy choice against visitation orders like the one before us. Grandparents often can now obtain visitation orders after stepparent adoption. Yet, only one statute that expressly considers post-adoption visitation is broad enough to encompass the Vest visitation order. *See L.F.M.*, 507 A.2d at 1159–60 (discussing grandparent visitation statutes); *In re Adoption of Ridenour*, 574 N.E.2d at 1062 (same).

Thirty states other than New Mexico have statutes addressing post-adoption visitation. Twenty-four statutes do not contemplate visi-

---

**3.** See footnote 7.

tation after an adoption by strangers. The statutes in these twenty-four states vary as to when, if ever, post-adoption visitation is authorized, but none appears to apply when the adoption is by someone other than a stepparent, grandparent, or other biological relative. Ala.Code § 26–10A–30 (1990); Ariz.Rev.Stat.Ann. § 25–337.01 (1992); Cal. Civ.Code § 197.5 (West 1982) (operative until Jan. 1, 1994); Cal.Fam.Code § 3102 (1993) (operative Jan. 1, 1994); Colo.Rev.Stat. § 19–1–117 (1992); Fla.Stat.Ann. §§ 752.01, 752.07 (Harrison 1991); Ga.Code Ann. § 19–7–3 (1992); 750 Ill.Comp.Stat. 5/607, 5/11–7.1 (1993); Ind.Code § 31–1–11.7–2 (1992); Iowa Code Ann. § 598.35 (West Cum.Supp.1993); Kan.Stat.Ann. § 38–129 (1991); Mass.Ann. Laws ch. 119, § 39D (Law.Co-op.1992); Mich.Comp.Laws § 722.27b (1991); Minn. Stat. § 257.022 (1992); Miss.Code Ann. § 93–16–7 (1991); Mont.Code Ann. § 40–9–102 (1992); N.H.Rev.Stat.Ann. § 458:17–d (1991); N.C.Gen.Stat. §§ 50–13.2, 50–13.2A (1987); N.D.Cent.Code § 14–09–05.1 (1991); 23 Pa. Con.Stat. § 5314 (1992); S.D.Codified Laws Ann. § 25–4–54 (1992); Tenn.Code Ann. § 36–6–301 (1991); Tex.Fam.Code Ann. § 14.03 (West 1986); Vt.Stat.Ann. tit. 15, § 1016 (1989); Wyo.Stat. § 20–7–101 (1992).

Delaware approves post-adoption grandparent visitation, but if the parents are cohabiting, visitation cannot be ordered over both parents' objection. Del.Code Ann. tit. 10, § 950 (1992). Three other states appear to contemplate visitation after any type of adoption, but only for grandparents. La.Children's Code arts. 1256, 1264 (1992); Mo.Rev.Stat. § 452.402 (1991); Okla.Stat. tit. 10, §§ 5, 60.16 (Cum.Supp.1993). *See Hill v. Moorman,* 525 So.2d 681 (La.Ct.App.1988) (enforcement of agreement to permit post-adoption visitation by natural mother would violate public policy). Nevada's statute, which does not mention adoption, permits visitation after termination of parental rights but solely for parents, grandparents, and siblings. Nev.Rev.Stat.Ann. § 127.171 (Michie

1991). Alaska permits post-adoption visitation but for no one other than natural parents and other relatives. Alaska Stat. § 25.-23.130(c) (1991). Only Connecticut's visitation statute could be read to authorize the Vest visitation order, Conn.Gen.Stat. § 46b–59 (1986), yet no reported case has exercised such power. *Cf. In re Jennifer P.,* 17 Conn. App. 427, 553 A.2d 196, *cert. denied,* 211 Conn. 801, 559 A.2d 1136 (Conn.1989) (former foster parent may seek visitation with child in custody of department of children and youth services).

These authorities, judicial and legislative, from other states should engender doubt concerning the majority's apparent belief that the judiciary's case-by-case evaluation of the best interests of the child is the sole criterion in deciding matters of child custody and visitation.[4] The discussion of these authorities is not intended, however, as a substitute for an analysis of the pertinent New Mexico law. After all, many of us are proud of the uniqueness of New Mexico in many respects; New Mexico could well be unique with respect to judicial authority to order post-adoption visitation. Nevertheless, on this issue New Mexico is in the great mainstream of American life. There was no authority to issue the Vest visitation order. Statutory language does not authorize the order, legislative policy forbids the order, and the courts have no inherent power to ignore the legislature on the matter. I shall begin with a discussion of the pertinent statutes.

## II. THE PERTINENT NEW MEXICO STATUTES

### A. The Adoption Act

The New Mexico Adoption Act, NMSA 1978, §§ 40–7–29 to –61 (Repl.Pamp.1989), makes no provision for visitation after adoption. The majority opinion notes that the Act "neither specifically authorizes nor specifically forbids an adoption decree incorporating visitation rights for nonrelatives."

---

4. Indeed, even the majority does not embrace that position completely. The lead opinion, in something of an afterthought, restricts the granting of visitation rights to situations in which "the party seeking visitation has acted in a custodial or parental capacity." Yet, the opinion provides

no rationale for this limitation and fails to reconcile its conclusion with the New Mexico statute on grandparent visitation, which authorizes grandparent visitation orders even when the grandparents have never exercised custody. *See* NMSA 1978, §§ 40–9–1 to –4.

That observation might support the Vest visitation order if there were some independent source of authority for a district court to order visitation after adoption, a matter I will discuss later in this opinion; but at least one must conclude that the Adoption Act in itself is not authority for the order in this case. Although the majority opinion suggests that the authority for the Vest visitation order has a similar origin to judicial authority for visitation in a divorce proceeding, nothing in the Adoption Act parallels the section in the statute governing dissolution of marriage stating that the court "may make such an order for the guardianship, care, custody, maintenance and education of the minor children, ... as may seem just and proper." NMSA 1978, § 40–4–7(B)(4) (Repl.Pamp. 1989); *see* NMSA 1978, § 40–4–9.1(L)(8) (Repl.Pamp.1989) (definition of "visitation" in joint custody statute). The Adoption Act refers to the child's best interests solely to require that the decree of adoption be granted only if "the best interests of the adoptee are served by the adoption." Section 40–7–51(A)(7). The Act does not contemplate orders conditioning the adoption or restricting the adoptive parents after adoption.

Moreover, there is evidence of legislative intent beyond simply the omission from the Adoption Act of any explicit authority to grant visitation after adoption. Section 40–7–52 in the Act states, "[A]fter adoption, the child and the petitioner shall sustain the legal relation of parent and child as if the adoptee were the biological child of the petitioner[.]" *See In re Estate of Holt,* 95 N.M. 412, 414, 622 P.2d 1032, 1034 (1981) ("From the point of adoption on, the adopted child belongs to the adoptive parents as if he or she had been their natural child, with the same rights of a natural child, *all to the exclusion of the natural parents.*"); *In re Visitation of Menzie,* 469 N.E.2d 1225 (Ind.Ct.App.1984).

The majority view Section 40–7–52 as limited to rights of inheritance, or at least as not clearly going any further. What cold fish the legislators must have been to contemplate

the rights of inheritance as encompassing the entire "legal relation of parent and child." The legislature could not have used broader language in Section 40–7–52. We should not be so intent on arrogating more power to the district courts that we refuse to recognize any obstacle in our path. The natural reading of the statutory language is that the district court has no greater authority to interfere with the parent-child relationship after adoption than it would have if the parent were the biological parent. *Hahn v. Sorgen,* 50 N.M. 83, 171 P.2d 308 (1946), is not to the contrary.

Because the district court has no authority to order visitation when a child is raised by his or her two natural parents, so long as the parents are alive and married and have not neglected or abused the child, *see Hawk,* 855 S.W.2d at 577 ("[T]he trial court's interference with the united decision of admittedly good parents represents a virtually unprecedented intrusion into a protected sphere of family life."); *id.* at 579 ("[W]ithout a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the 'best interests of the child' when an intact, nuclear family with fit, married parents is involved."), the court has no such authority over adoptive parents either—at least absent some additional statutory provision. Looking at the Adoption Act alone, legislative policy and intent undoubtedly free fit adoptive parents from judicial interference with respect to visitation.

### B.  The Grandparent Visitation Act

Further demonstration of legislative policy and intent appears in Article 9 of Chapter 40 (Repl.Pamp.1989) of the New Mexico statutes, which governs visitation by grandparents. I will refer to Article 9 as the Grandparent Visitation Act. The provisions of the Act are as follows: [5]

**40–9–1.  Dissolution of marriage or legal separation; parentage; judgment; visitation privileges.**

In rendering a judgment of dissolution of marriage, legal separation or the exis-

---

**5.**  After trial of this case the Act was superseded by the Grandparent's Visitation Privileges Act. NMSA 1978, §§ 40–9–1 to –4 (Cum.Supp.1993).

The changes in the language of the article do not appear to be pertinent to the discussion in this opinion.

tence of the parent and child relationship pursuant to the Uniform Parentage Act [NMSA 1978 §§ 40–11–1 to 40–11–23] or at any time after the entry of such decree, the district court may grant reasonable visitation privileges to a grandparent of a minor child, not in conflict with the child's education or prior established visitation privileges.

**40–9–2. Children; visitation by grandparents.**

A. If one or both parents of a minor child are deceased, any grandparent of the minor may petition the district court for visitation privileges with respect to the minor.

B. If a minor child has resided with a grandparent for a period of six months or more and is subsequently removed from the home by a parent, the grandparent may petition the district court for visitation privileges with respect to the child.

C. An adoption of a minor child by a stepparent pursuant to the Adoption Act under which the rights of the natural parents are relinquished or terminated shall not act to preclude the biological grandparents of the minor child from receiving visitation rights.

**40–9–3. Visitation; restrictions.**

A. Under either Section 1 or 2 [§§ 40–9–1 or 40–9–2] of this act, the court may grant reasonable visitation privileges to a grandparent if the court determines that it is in the best interests and welfare of the child, and may issue any necessary order to enforce the visitation privileges and may modify such privileges or order upon a showing of good cause by any interested person.

B. Absent a showing of good cause, no grandparent may file a petition pursuant to this act more often than once a year.

C. If a petition is denied pursuant to this act, the court may award court costs and a reasonable attorney fee against the petitioning party.

**40–9–4. Applicability.**

Chapter 40, Article 9 NMSA 1978 shall apply to the statutory adoptions described in Paragraphs (2), (3), (4) and (5) of Subsection A of Section 40–7–34 NMSA 1978 [which relate to adoptions by a stepparent, a relative, a person named in a deceased person's will, or a godparent]. If the petition made under Chapter 40, Article 9 NMSA 1978 is made during the pendency of the adoption proceedings, the petition shall be filed as part of the adoption proceedings. Chapter 40, Article 9 NMSA 1978 shall have no application in the event of a relinquishment or termination of parental rights in cases of other statutory adoption proceedings.

The Grandparent Visitation Act is noteworthy in three respects. First, if the lead opinion is correct in its view that district courts have power to order visitation whenever it is in the best interests of the child, then the Act is unnecessary. *See In re Marriage of Gayden*, 280 Cal.Rptr. at 867 (if visitation rights could be granted to any nonparent upon finding that it was in child's best interests, then California's specific visitation statutes would be "meaningless"). One can only assume that the New Mexico legislatures which have enacted and amended the Act did not share the view that district courts already possessed the power to order grandparent visitation after adoption.

Second, the legislature saw fit to provide for post-adoption visitation only by grandparents. No statutory provision expressly provides for post-adoption visitation by any other persons. The legislature has not granted judges the power to decide whether it is in the best interests of the child to order post-adoption visitation by persons who are not the child's grandparents.

Third, and most importantly, the Grandparent Visitation Act draws a line in its authorization of post-adoption grandparent visitation. The Act provides for post-adoption visitation only when the adoption is by a stepparent (Section 40–7–34(A)(2)), a relative (Section 40–7–34(A)(3)), a "person named in a deceased parent's will to take care of that child" (Section 40–7–34(A)(4)), or a godparent (Section 40–7–34(A)(5)). *See* § 40–9–4. These situations in which grandparent visitation can be ordered are also the only situations in which the Adoption Act permits court approval of a petition to adopt a child

even though the child has not been placed for the purpose of adoption in the home of the proposed adopting parents. Section 40-7-34(A). The placement may be by HSD, HSD's counterpart in another state, a licensed agency, or the child's parent or grandparent. *Id.* Thus, a comparison of the Adoption Act and the Grandparent Visitation Act reveals that the Grandparent Visitation Act does not apply when the adopted child was placed for adoption.

The legislative intent is clear: A district court cannot order grandparent visitation after an adoption by placement even if the court finds visitation to be in the best interests of the child. The legislature must have based its decision on the ground that such court-ordered visitation will be too disruptive for the child, will improperly infringe on parental rights of the adoptive parents, will discourage people from becoming adoptive parents, or some combination of these reasons. The detailed statutory language describing when visitation is proper compels one to "assume the legislature acted deliberately in limiting outside visitation privileges." *In re Marriage of Freel,* 448 N.W.2d 26, 28 (Iowa 1989). "[L]egislative intent is expressed by omission as well as inclusion." *Id.* (quoting *Barnes v. Iowa Department of Transp.,* 385 N.W.2d 260, 263 (Iowa 1986)). Given the imprimatur that the Act provides for grandparent visitation as a general rule, the unmistakable legislative signal is that district courts should not order visitation by anyone after a child is placed for adoption.

In short, the New Mexico Legislature has expressed (1) its understanding that post-adoption visitation cannot be ordered in the absence of statute and (2) its policy that (a) only grandparents are entitled to post-adoption visitation and (b) a judge should not order visitation of an adopted child who was placed for adoption, even if the judge finds such visitation to be in the child's best interests. There is no legislative authority for the visitation order in this case. Perhaps that is bad policy, but it is the law.[6]

---

**6.** If anything, that legislative policy became clearer this year. The 1993 legislature has added a new section of the Adoption Act entitled "Open Adoptions." NMSA 1978, § 32-5-35 (1993

## III. INHERENT AUTHORITY

The majority suggests that there is a non-statutory source of authority for the district court order: the inherent equitable power of the courts in dealing with children. The lead opinion implicitly assumes that this inherent power can trump statutory law and public policy expressed by the legislature. This view misconceives the nature and extent of equitable power over children. The great weight of authority is to the contrary. I shall first note the few court opinions that could be considered as support for the existence of inherent authority, although none of the opinions states that this authority would prevail over an opposing legislative mandate.

### A. Case Law in Other Jurisdictions

I am aware of authoritative opinions in only four jurisdictions that can be read to suggest an inherent judicial power to order post-adoption visitation: *In re Adoption of Children by F.,* 170 N.J.Super. 419, 406 A.2d 986 (Ch.Div.1979); *Kattermann v. DiPiazza,* 151 N.J.Super. 209, 376 A.2d 955 (App.Div. 1977); *Morse v. Daly,* 101 Nev. 320, 704 P.2d 1087 (1985); *Preston v. Mercieri,* 133 N.H. 36, 573 A.2d 128 (1990); *Petition of Dep't of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 467 N.E.2d 861 (1984); *cf. In re Guardianship of Nemer,* 419 N.W.2d 582 (Iowa 1988) (inherent right to order visitation in guardianship proceeding continues when guardians adopt child). Each provides only tenuous authority.

Although one could read both New Jersey decisions—*In re Adoption of Children by F.,* a one-judge opinion, and *Kattermann,* a two-to-one opinion—as relying on inherent authority, that view would seem inconsistent with the approach taken by New Jersey's highest court in *Mimkon v. Ford,* 66 N.J. 426, 332 A.2d 199 (1975), which treated the question of post-adoption grandparent visitation as a matter of statutory interpretation, reconciling the adoption statute and the statute authorizing visitation. I find it notewor-

---

N.M.Laws, ch. 77, § 162). The new provision permits contact between the adopted child and the natural parents or their relatives, but only with the consent of the adoptive parents.

thy that *In re Guardianship of R.O.M.C.*, 243 N.J.Super. 631, 581 A.2d 113, 114 (App. Div.1990), described both *In re Adoption of Children by F.* and *Kattermann* as interpreting the adoption acts then in effect.

*Morse* relies primarily on lower-court New York opinions. Those opinions have been undermined by a recent ruling of New York's highest court that only the legislature can authorize the judiciary to issue visitation orders when a child has been adopted into a new family. *In re Gregory B.*, 74 N.Y.2d 77, 544 N.Y.S.2d 535, 542 N.E.2d 1052 (1989); *see Alison D. v. Virginia M.*, 77 N.Y.2d 651, 569 N.Y.S.2d 586, 572 N.E.2d 27 (1991). The reliance by *Morse* on *In re Adoption of Children by F.* is also questionable, as discussed in the previous paragraph. The other opinions cited by *Morse* are founded on visitation statutes, not inherent equitable power.

*Preston*, 573 A.2d at 132, invoked an inherent parens patriae power. The court relied on its prior decision in *Roberts v. Ward*, 126 N.H. 388, 493 A.2d 478 (1985), which, however, did not involve an adoption. The cases cited by *Roberts* as supporting a non-statutory basis for granting visitation, *see id.* at 482, did not involve adoption proceedings, except for *Krieg v. Glassburn*, 419 N.E.2d 1015 (Ind.Ct.App.1981), which stated that visitation rights are terminated by adoption, *id.* at 1021 n. 6.

*Petition of Dep't of Social Services* did not actually affirm a post-adoption visitation order. It merely permitted consideration of the possibility. 467 N.E.2d at 866. In any event, it relied for its authority only on *Petition of New Bedford Child & Family Service to Dispense with Consent to Adoption*, 385 Mass. 482, 432 N.E.2d 97 (1982), in which the court, affirming a refusal to terminate parental rights, had noted broad judicial authority to protect children; post-adoption visitation was not an issue.

In contrast to these four jurisdictions are the decisions in many other jurisdictions that have considered whether courts may order post-adoption visitation by persons other than natural parents [7] in the absence of statutory language specifically addressing post-adoption visitation. A slight majority of these cases have denied post-adoption visitation. *Ex parte Bronstein*, 434 So.2d 780 (Ala.1983); *In re WEG*, 710 P.2d 410 (Alaska 1985); *In re Marriage of Herreras*, 159 Ariz. 511, 768 P.2d 673 (Ct.App.1989); *Poe v. Case*, 263 Ark. 488, 565 S.W.2d 612 (1978); *Lee v. Kepler*, 197 So.2d 570 (Fla.Dist.Ct.App.1967); *In re Visitation of Menzie*, 469 N.E.2d 1225 (Ind.Ct.App.1984); *Browning v. Tarwater*, 215 Kan. 501, 524 P.2d 1135 (1974); *Smith v. Trosclair*, 321 So.2d 514 (La.1975); *L.F.M. v. Department of Social Servs.*, 67 Md.App. 379, 507 A.2d 1151 (1986); *Bikos v. Nobliski*, 88 Mich.App. 157, 276 N.W.2d 541 (1979); *Aegerter v. Thompson*, 610 S.W.2d 308 (Mo.Ct. App.1980); *Acker v. Barnes*, 33 N.C.App. 750, 236 S.E.2d 715, *cert. denied*, 293 N.C. 360, 238 S.E.2d 149 (1977); *In re Fox*, 567 P.2d 985 (Okla.1977); *State ex rel. Grant v. Keegan*, 114 Or.App. 549, 836 P.2d 167, *review denied*, 314 Or. 728, 843 P.2d 455 (1992); *Ex parte Pepper*, 544 S.W.2d 836 (Tex.Civ. App.1976), *writ dismissed*, 548 S.W.2d 884 (Tex.1977); *Kasper v. Nordfelt*, 815 P.2d 747 (Utah Ct.App.1991); *Bond v. Yount*, 47

---

7. For cases on postadoption visitation by natural parents, *see Danny R. Veilleux*, Annotation, *Postadoption Visitation by Natural Parent*, 78 A.L.R.4th 218 (1990). The annotation lists seven jurisdictions—Maryland, Massachusetts, Missouri, Nevada, New Jersey, New York, and Utah—as having cases indicating that courts may issue such visitation orders despite the absence of an agreement for visitation. *Id.* § 11, at 240. These cases add no material weight to the cases I have previously mentioned as providing some authority for an inherent judicial power to order post-adoption visitation. I have already discussed the cases from Massachusetts, Nevada, and New Jersey, and noted the present law in New York. The Maryland case, *Spencer v. Franks*, 173 Md. 73, 195 A. 306 (1937), contains only a brief, vague

dictum, *id.* at 311–12, which was ignored in *L.F.M. v. Department of Social Services*, 67 Md. App. 379, 507 A.2d 1151 (1986). The Missouri case, *Kambitch v. Ederle*, 642 S.W.2d 690, 693–94 (Mo.Ct.App.1982), similarly contains only the barest dictum. The mention of open adoption in the Utah case, *In re Adoption of Halloway*, 732 P.2d 962, 972 n. 11 (Utah 1986), does not even rise to the level of dictum; the opinion does not suggest that Utah law allows orders for postadoption visitation by natural parents. The annotation lists twelve jurisdictions as holding that adoption precludes visitation by a natural parent absent a visitation agreement, *id.* § 10, and lists five more as forbidding enforcement of agreements for post-adoption visitation, *id.* § 5.

Wash.App. 181, 734 P.2d 39 (1987); *In re Adoption of RDS*, 787 P.2d 968 (Wyo.1990).

Other jurisdictions have approved the practice in some circumstances. *Reeves v. Bailey*, 53 Cal.App.3d 1019, 126 Cal.Rptr. 51 (1975); *In re Marriage of Aragon*, 764 P.2d 419 (Colo.Ct.App.1988); *Smith v. Finstad*, 247 Ga. 603, 277 S.E.2d 736 (1981); *Lingwall v. Hoener*, 108 Ill.2d 206, 91 Ill.Dec. 166, 483 N.E.2d 512 (1985); *Patterson v. Keleher*, 365 N.W.2d 22 (Iowa 1985); *Hicks v. Enlow*, 764 S.W.2d 68 (Ky.1989); *Mimkon v. Ford*, 66 N.J. 426, 332 A.2d 199 (1975); *Layton v. Foster*, 61 N.Y.2d 747, 472 N.Y.S.2d 916, 460 N.E.2d 1351 (1984); *Suroviec v. Mitchell*, 347 Pa.Super. 399, 500 A.2d 894 (1985); *Puleo v. Forgue*, 610 A.2d 124 (R.I.1992); *Chavis v. Witt*, 285 S.C. 77, 328 S.E.2d 74 (1985); *In re Petition of Nearhoof*, 178 W.Va. 359, 359 S.E.2d 587 (1987); *In re C.G.F.*, 168 Wis.2d 62, 483 N.W.2d 803, *cert. denied*, — U.S. —, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); *see In re Adoption of Ridenour*, 574 N.E.2d at 1062 n. 6 (apparently approving *Welsh v. Laffey*, 16 Ohio App.3d 110, 474 N.E.2d 681 (1984)).

Regardless of the result, all of these opinions treated the issue as one of statutory interpretation—how to reconcile statutes granting visitation rights with adoption statutes that give full authority to adoptive parents. Some opinions explicitly mention that the matter is for the legislature to decide, *e.g., Poe*, 565 S.W.2d at 613; *Hicks*, 764 S.W.2d at 71; *In re Adoption of G.D.L.*, 747 P.2d 282, 284–85 (Okla.1987); *In re Adoption of Ridenour*, 574 N.E.2d at 1063; *State ex rel. Grant*, 836 P.2d at 169; *In re Petition of Nearhoof*, 359 S.E.2d at 589 n. 3. *See also In re Adoption of Gardiner*, 287 N.W.2d 555, 556 (Iowa 1980) (adoption was unknown at common law[8] and is solely statutory); *L.F.M.*, 507 A.2d at 1157 (same); *Olson v. Flinn*, 484 So.2d 1015, 1017 (Miss.1986) (no common-law right of grandparent visitation).

In the other opinions that view is implicit in the approach the courts take in deciding the case. None of these decisions recognizes an inherent power to order visitation in the best interests of the child irrespective of legislative power or policy.

There are good reasons not to rely on an inherent judicial power to issue the Vest visitation order. First, the traditional power of courts to act in the best interests of the child does not extend to this context. Second, judicial power to care for children is subordinate to legislative authority.

## B. Traditional Authority

Equity jurisdiction has never given the judiciary a roving commission to improve the welfare of children. Traditionally, equity has limited its role to controlling guardians and caring for children who have been abandoned, neglected, or abused.

> The Court will not interfere with the father in the exercise of his paternal authority, except (1) where by his gross moral turpitude he forfeits his rights, or (2) where he has by his conduct abdicated his paternal authority, or (3) where he seeks to remove his children, being wards of court, out of the jurisdiction without the consent of the court.[9]

4 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 1307 n. 5 (Spencer W. Symons ed., 5th ed. 1941) [hereinafter Pomeroy]. More recently, the New Jersey Supreme Court wrote that "the State's *parens patriae* responsibility to protect the welfare of children ... is limited to situations in which the state has demonstrated that the child's parent or custodian is unfit [*Developments, supra,* at 1219] or the child has been neglected or harmed, *see State v. Perricone*, 37 N.J. 463, 181 A.2d 751, *cert. denied*, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962) [blood

---

8. In this context common-law authority encompasses the powers of courts of equity. *See Mertens v. Hewitt Assocs.*, — U.S. —, —, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993) (discussing powers of "common-law court of equity").

9. For this proposition Pomeroy cites *Agar–Ellis v. Lascelles*, 24 Ch.Div. 317 (1878). In *Agar–*

*Ellis,* the father had voluntarily made his children wards of the court, while retaining legal custody of the children, as the result of a disagreement with his estranged wife over the children's religious upbringing. The justices declined to interfere with the father's wishes regarding visitation with the mother, because none of the reasons for overriding the father's wishes existed.

transfusion]." *In re Guardianship of J.C.*, 129 N.J. 1, 608 A.2d 1312, 1316 (1992).

New Mexico law is not to the contrary. The lead opinion quotes the following from *In re Guardianship Petition of Lupe C.*, 112 N.M. 116, 119, 812 P.2d 365, 368 (Ct.App. 1991): "[O]ur supreme court has held that the district court sitting as a court of equity has inherent power concerning issues of custody of minors." What is missing from the lead opinion are the next three sentences from the quoted opinion:

> This power, however, is usually exercised when there is no other parent or individual to act for the child. *See* [Pomeroy, *supra*,] Ch. X, § 1306. While equity may have the power to take custody away from a parent, it will do so only in extreme circumstances. *Id.*, § 1307. This inherent power is limited to situations where there is no other available or adequate remedy at law. *See, e.g., In re Cabrera*, 381 Pa.Super. 100, 552 A.2d 1114 (1989) (authorizing appointment of a guardian to give consent to medical treatment when death may occur from refusal of treatment).

*In re Guardianship Petition of Lupe C.*, 112 N.M. at 119, 812 P.2d at 368. These additional sentences suggest a far less expansive inherent power than was assumed by the district court in this case.

In particular, New Mexico decisions have recognized the limitations on inherent judicial power with respect to adoptions. Our Supreme Court has said that "[a]doption proceedings are solely statutory." *Mayer v. Department of Pub. Welfare*, 75 N.M. 201, 203, 402 P.2d 942, 943 (1965). I realize that *In re Adoption of Doe*, 101 N.M. 34, 37, 677 P.2d 1070, 1073 (Ct.App.), *cert. denied*, 101 N.M. 11, 677 P.2d 624 (1984), states that in adoption proceedings "the trial court is also invested with some equitable powers." That statement, however, does not refer to the adoption process itself but only to tasks traditionally performed by courts in determining whether natural parents should lose their parental rights. In support of the statement regarding equitable powers, *Doe* cited just two cases, both from Utah. Only one of those cases dealt with an adoption. In *Wilson v. Pierce*, 14 Utah 2d 317, 383 P.2d 925 (1963), the Utah Supreme Court apparently used equitable principles to determine that a child had been abandoned by the natural mother and therefore could be adopted. Likewise, the issue in *Doe* was whether the parental rights of the natural parents should be terminated when the actions of the person petitioning for adoption had caused the disintegration of the parent-child relationship between the natural parents and the children. The question that required the application of equitable principles was abandonment, a prerequisite to termination of parental rights and subsequent adoption. Neither *Doe* nor *Wilson* implies the power to issue the visitation order in this case. *See Kasper*, 815 P.2d at 749–51 (no grandparent visitation right in Utah after child placed for adoption).

As for *Christian Placement Service, New Mexico Christian Children's Home v. Gordon*, 102 N.M. 465, 697 P.2d 148 (Ct.App. 1985), it supports reversal rather than affirmance of the Vest visitation order. That opinion stated that "statutory visitation rights do not apply in adoption proceedings after the termination of the natural parents' rights," *id.* at 470, 697 P.2d at 153, and cited with implicit approval the cases that have held that "courts are not free to intervene on behalf of relatives who seek visitation rights after an adoption decree which terminates parental rights." *Id.* Nothing in *Gordon* suggests that a grandparent could obtain visitation rights after an adoption. On the contrary, this Court wrote, "[B]ecause the parental rights of one parent had been terminated, and the other parent had relinquished her rights and consented to the adoption, the trial court was not authorized to grant visitation rights. Under these circumstances, [the grandmother] was not entitled to intervene as a matter of right." *Id.* at 472, 697 P.2d at 155. The opinion later suggested only that the grandmother might have a ground for permissive intervention if her participation in the proceeding could assist the court in determining the best interests of the child—that is, whether the petition for adoption should be granted. There is a great difference between (1) permitting a grandparent to participate in an adoption proceeding as a party to assist the court in determining whether to grant the petition for adoption

and (2) permitting a grandparent to intervene in order to assert a right to post-adoption visitation. Although *Gordon* suggested that the first type of intervention may be permissible, it unequivocally stated that the second type of intervention was not.

In short, New Mexico follows the common-law tradition of exercising equitable power over children only in limited circumstances, which do not include adoption by fit parents.

## C. Legislative Supremacy

The above authorities cast grave doubt on any claim of non-statutory judicial power to order post-adoption visitation. In any event, even if such non-statutory authority existed, it would be subordinate to legislative power. As the United States Supreme Court stated in *Late Corporation of the Church of Jesus Christ of Latter–Day Saints v. United States,* 136 U.S. 1, 56–57, 10 S.Ct. 792, 807–808, 34 L.Ed. 478 (1890), in the United States "the legislature is the *parens patriae;* and, unless restrained by constitutional limitations, possesses all the powers in this regard which the sovereign possesses in England." *See id.* at 56–58, 10 S.Ct. at 808. Although state legislatures may have delegated this power to courts of equity, *see Developments, supra,* at 1222, the legislature still has the last word. *See Late Corporation,* 136 U.S. at 62, 10 S.Ct. at 809–810. None of the opinions discussed in subsection III(A) above as supporting a claim of inherent equitable power to order visitation went so far as to state that this inherent power prevailed over legislation.

To be sure, when there is a long-recognized tradition of judicial exercise of certain equitable powers—such as the power to fashion equitable remedies—courts may infer that the legislature implicitly continued that power in the absence of a clear contrary legislative command. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (legislation did not limit court's equitable authority not to grant injunctive relief). Such an inference is a common-sense approach to determining legislative intent. Here, however, there is no long (or even short) equity tradition of ordering post-adoption visitation. The only perti-

nent case law, *Gordon,* denies authority for such an order.

Moreover, the courts recognize that ordinarily the legislative branch possesses ultimate authority. *See Weinberger,* 456 U.S. at 313, 102 S.Ct. at 1804. (The exceptional case would be when the legislature's action is unconstitutional, as when it violates separation-of-powers doctrine, an issue that is independent of the distinction between law and equity. *See Cooper v. Otero,* 38 N.M. 164, 29 P.2d 341 (1934) (statute requiring court to appoint bank examiner as receiver violates independence of judiciary by telling courts whom to select as officers of the court).) Thus, the New Mexico Supreme Court, while recognizing inherent equitable powers to appoint receivers of corporations, *see Cooper,* 38 N.M. at 167–69, 29 P.2d at 343–44, has followed statutory mandates governing particular types of receiverships, *see Cooper v. Manning,* 39 N.M. 206, 208–09, 43 P.2d 1055, 1056–57 (1935) (bank receivership). It has also recognized the replacement of inherent equitable jurisdiction by statutory proceedings providing for dependent and neglected children. *Blanchard v. State ex rel. Wallace,* 29 N.M. 584, 586–87, 224 P. 1047, 1048 (1924).

In addition, courts ordinarily should not exercise equitable power in disregard of public policy expressed by the legislature. An early treatise noted:

> It is the duty of every court of justice, whether a court of law or of equity, to consult the intention of the legislature ... nor does it any where appear that, in the discharge of this duty, courts of equity are invested with a larger or more liberal discretion than courts of law.

1 Henry Ballow & John Fonblanque, *A Treatise of Equity* ch. 1, § 3(h) (2d American ed. 1820). Blackstone and Story also advocated restraint:

> [T]he liberty of considering all cases in an equitable light must not be indulged too far; lest thereby we destroy all law; and leave the decision of every question entirely in the breast of the judge. And law, without equity, though hard and disagreeable, is much more desirable for the public good, than equity without law; which

would make every judge a legislator, and introduce most infinite confusion; as there would then be almost as many different rules of action laid down in our courts, as there are differences of capacity and sentiment in the human mind.

1 William Blackstone, *Commentaries on the Laws of England*, intro. § 2, ¶ 62 (Chitty ed. 1827).

[D]iscretion is a science, not to act arbitrarily, according to men's wills and private affections; so the discretion, which is executed here, is to be governed by the rules of law and equity, which are not to oppose, but each in its turn to be subservient to the other. This discretion, in some cases, follows the law implicitly; in others, assists it, and advances the remedy; in others again, it relieves against the abuse, or allays the rigor of it. But, in no case, does it contradict or overturn the grounds or principles thereof, as has been sometimes ignorantly imputed to the Court. That is a discretionary power, which neither this, nor any other Court, not even the highest, acting in a judicial capacity, is by the constitution entrusted with.

1 Joseph Story, *Commentaries on Equity Jurisprudence* § 13 (photo. reprint 1972) (1836).

As I have already indicated, the New Mexico Adoption Act and Grandparent Visitation Act convey clear legislative policies: (1) after an adoption the only persons for whom visitation can be ordered are grandparents and (2) if the child has been adopted after a placement for adoption, visitation cannot be ordered on behalf of anyone. These legislative policies prevail over any asserted inherent judicial power to order post-adoption visitation. There is no reason to require the legislature to be any more explicit in expressing these policies than it was in the Adoption Act and the Grandparent Visitation Act.

### D. Summary

The district court had no inherent equitable power to enter the Vest visitation order. Traditional equitable power over children does not apply when the child's parents are fit and caring for the child's health and safety. Even if there were a tradition supporting power to enter a post-adoption visitation order, it would have to yield to the clear statutory policy of New Mexico.

## IV. CONCLUSION

Although the intentions of the district court may have been admirable, the court had no authority to order visitation for Rita Vest. I respectfully dissent from the majority view that the court had authority to order visitation if visitation was in the best interests of the child regardless of the fitness and conduct of the adoptive parents.