In the Matter of the GUARDIANSHIP and Conservatorship OF Nathan Paul NEMER.

Boulos NEMER, Mountaha Nemer, and Michael Nemer, Appellants,

v.

Becky Lynn SWEENEY, Guardian and Conservator of Nathan Paul Nemer, n/k/a Nathan Paul Sweeney, Appellee.

No. 86–1134.

Supreme Court of Iowa.

Feb. 17, 1988.

Rehearing Denied March 11, 1988.

Carroll L. Lucht and Patricia N. Fetzer, Iowa City, Crystal M. Greiman and Connie Fox–Samson, Student Legal Interns, for appellants.

David L. Wetsch, Des Moines, for appellee.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO and NEUMAN, JJ.

NEUMAN, Justice.

This is an appeal from the district court's dismissal of an action brought to enforce grandparent visitation rights in a guardianship proceeding. Two narrow questions must be answered: First, are grandparent visitation rights awarded by a district court exercising its probate jurisdiction in a guardianship proceeding automatically terminated by a subsequent intrafamily adoption? Second, does the required visitation continue to be in the grandchild's best interest? Because the first question has previously been answered by this court in *In re Guardianship and Conservatorship of Ankeney*, 360 N.W.2d 733 (Iowa 1985) and *Patterson v. Keleher*, 365 N.W.2d 22 (Iowa 1985), and because our de novo review of the record discloses no circumstances which would detract from the district court's earlier finding that grandparent vis-

itation is in the best interest of the minor child, we reverse the judgment of the district court.

Appellants Boulos and Mountaha Nemer are the paternal grandparents of Nathan Sweeney, whose parents tragically died in a murder-suicide in April 1982. Nathan was then two years old. His maternal aunt, appellee Becky Sweeney, was appointed temporary guardian and conservator. The appointment was contested by the Nemers who sought Nathan's custody. The district court, after considering evidence from family members and child development specialists, determined that the Sweeney home presented a loving, stable environment for Nathan's upbringing. The court also found, however, that Nathan had spent considerable time in the home of Boulos and Mountaha Nemer prior to his parents' death and had "developed bonds of affection to all members of the paternal family." The court therefore concluded that Nathan's best interest would be served by continuing his custody with Becky Sweeney and allowing the Nemers visitation rights of one Saturday each month in the first year, and more frequently thereafter.

This visitation proceeded as contemplated for only a short time. In November 1982, Becky Sweeney and her husband Brad adopted Nathan. The adoption decree made no provision for the paternal grandparents' visitation. Thereafter the Sweeneys resisted all efforts by the Nemers to contact or communicate with Nathan. Attorneys for both the Sweeneys and the Nemers advised their clients that the adoption terminated any legal rights Boulos or Mountaha Nemer once had to a continuing relationship with their grandson. *See* Iowa Code § 600.13(4) (1985) ("A final adoption decree terminates any parental rights ... existing at the time of its issuance and establishes the parent-child relationship between the adoption petitioner and the person petitioned to be adopted."); *In re Adoption of Gardiner*, 287 N.W.2d 555, 558 (Iowa 1980) ("The grandparents' status as grandparents, and hence their right to visitation under § 598.35, arises by virtue of the child's relationship to the natural

parents. When adoption terminates the natural parents' rights in the child and thereby removes the basis for the grandparents' rights, the grandparents' rights also end.")

In 1985, the Nemers learned of two decisions announced by this court which signaled a departure from the strict "derivative rights" analysis exemplified by *Gardiner*. *In re Guardianship and Conservatorship of Ankeney*, 360 N.W.2d 733, 734 (Iowa 1985), and *Patterson v. Keleher*, 365 N.W.2d 22, 23–24 (Iowa 1985), both raised the issue whether a grandparent's court-decreed right to visit a grandchild survives that child's adoption by a stepparent. In each case we held that a decree of adoption does not automatically nullify or invalidate the jurisdiction of a probate or other court sitting in equity whose authority is dictated by the best interests of the ward. *Ankeney*, 360 N.W.2d at 737; *Patterson*, 365 N.W.2d at 25.

With this precedent before them, the Nemers filed an application with the district court to cite Becky Sweeney for contempt for her failure to allow the ordered visitation or, in the alternative, to enforce the visitation rights which were previously found to be in Nathan's best interest. After hearing, the district court dismissed the contempt action, a decision not challenged on this appeal. The court did, however, decline to enforce the Nemers' visitation rights, concluding that "an intrafamily adoption, which gives the minor child two new, though previously related parents, ... terminates a prior guardianship order authorizing visitation for the grandparents and other relatives." The court also concluded that "mandated visitation with the Nemers, after a lapse of three years, would unduly interfere and disrupt the relationship between Nathan and his adoptive parents." It is from these rulings that appellants appeal.

I. The district court's conclusion that the 1982 visitation order was invalid and unenforceable contradicts the law as interpreted by this court in both *Ankeney*, 360 N.W.2d at 737, and *Patterson*, 365 N.W.2d at 25. In the case before us, nei-

ther the probate proceedings nor the responsibility of the guardian have been terminated in accordance with Iowa Code section 633.675. Given this procedural posture, an intervening, valid decree of adoption does not automatically terminate the guardianship or the authority of the probate court to ensure that the child's best interests are served. *Ankeney*, 360 N.W.2d at 737–38. The district court's ruling to the contrary was in error.

II. Despite its conclusion that the prior visitation order was unenforceable, the district court nevertheless proceeded to consider whether Nathan's best interest would be served by a resumption of contact with his paternal grandparents. Because of the equitable nature of such an inquiry, we review de novo the evidence presented on the question. *Ankeney*, 360 N.W.2d at 738. As in all cases involving the welfare of children, we are guided by the rule that our first and governing consideration must be the best interest of the child affected by our decision. Iowa R.App.P. 14(f)(15).

We note at the outset that this further inquiry by the court was apparently prompted by legislation enacted after the Nemers filed their petition, but prior to the hearing. The legislation amended the termination of parental rights statute, § 600A.10, by affording grandparents a right of visitation independent of their child's parental rights upon a showing that such visitation was in the child's best interest and would not "unduly disrupt the child's relationship with the person who has custody, *including an adoptive parent.*" 1986 Iowa Acts ch. 1123, § 1 (emphasis added). Reference to the statute explains the court's expressed concern that resumption of visitation would "unduly interfere and disrupt the relationship between Nathan and his adoptive parents." This legislation from which the court drew its "undue disruption" standard was repealed shortly thereafter and in its place the legislature expanded Iowa Code section 598.35, specifically authorizing the award of grandparent visitation rights in the event of stepparent adoption *without* reference to potential disruption in the adoptive family.

1987 Iowa Acts ch. 159, §§ 9, 10. The amended statute instead requires proof "that the grandparent had established a substantial relationship with the child prior to the filing of the petition." *Id.* § 9.

This evident legislative intent to break with the derivative rights approach to grandparent visitation espoused by this court in *Gardiner* is consistent with a trend nationwide to liberalize postadoption visitation by grandparents in the case of stepparent adoption. *See* Zablotsky, *To Grandmother's House We Go: Grandparent Visitation After Stepparent Adoption*, 32 Wayne L.Rev. 1, 9 (1985); Note, *Grandparent's Statutory Visitation Rights and the Rights of Adoptive Parents*, 49 Brooklyn L.Rev. 149, 170–71 (1982); Foster and Freed, *Grandparent Visitation: Vagaries and Vicissitudes*, 23 St. Louis U.L.J. 643, 659 (1979). We need not consider the merits of such legislation or its application to an intrafamily adoption, however, for appellants have insisted, both before the trial court and on appeal, that they are invoking the plenary jurisdiction of the probate court to consider Nathan's welfare as the ward in a guardianship irrespective of independent remedies which may now be available.

We therefore examine the record made in the district court. The testimony inescapably reveals that the Sweeneys bear a deep-seated fear and mistrust of the Nemers and their Lebanese heritage which is inextricably bound up in their resentment over the death of Nathan's mother. These are the same obstacles to visitation which the court considered and rejected in 1982. At that time the court found that Nathan had bonded affectionately with his paternal grandparents because of his frequent, almost daily contact with them, and that a continuation of that relationship was in his best interest. More than an ongoing fear of cultural diversity must be shown to overcome that earlier finding.

Of more substance is the concern we share with the trial court over the lapse of three years since Nathan has encountered his grandparents. Appellees argue that Nathan has no recollection of the Nemers and that to reintroduce them into his life would cause confusion and lead to inevitable questions about his parents and, perhaps, the circumstances surrounding their death. Child development specialists called to testify by both parties agreed, however, that Nathan's curiosity about his roots is inevitable and that it would be ideal for him to learn about his Lebanese heritage. As observed by Dr. Scott Schafer, a child psychologist, if Nathan's relationship with the Nemers is not maintained, it could be difficult, if not impossible, for Nathan to have those questions effectively answered. In view of the Sweeneys' attitude of fear and distrust, it seems to us unlikely that they would ever present a positive image of Nathan's father or his ethnic background. Moreover, we are persuaded that it would be in Nathan's best interest to have a trusting relationship already established with the Nemers before the questioning begins. *See Mimkon v. Ford*, 66 N.J. 426, 437, 332 A.2d 199, 205 (1975) ("continuous love and attention of a grandparent may mitigate feelings of guilt or rejection, which a child may feel at the death of ... a parent, and ease the painful transition").

The only reason the Nemers have not had contact with Nathan in the intervening years is because of the appellees' fierce refusal to permit it despite continued personal and legal efforts on behalf of the Nemers. We agree with the appellants' argument that "the best interest of the child" is a dynamic concept that cannot be confined or discarded based on the passage of time. Indeed, we are persuaded that Nathan's interests may best be served by reestablishing a grandparent relationship now, as he gains greater maturity, rather than permit him to grow to manhood with ignorance and doubts about his paternal family.

The Sweeneys vigorously argue that requiring them to allow the Nemers to visit Nathan will undermine their authority as parents and thereby disrupt their family. They offered the testimony of social worker and adoption investigator John Bandstra who, though never having met the Nemers, fully supported the Sweeneys' right to limit

Nathan's association with others in order to preserve their "potency" as parents, their "in-chargeness."

While we cannot quarrel with the general proposition that parental autonomy with regard to a child's social interaction is entitled to protection against unwarranted state intrusion, *see Olds v. Olds*, 356 N.W. 2d 571, 574 (Iowa 1984) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982)), such parental authority is not unlimited. In *Gardiner* we specifically rejected the suggestion that grandparent visitation, when against the wishes of the adoptive parents, would *never* be in the best interests of the minor child. 287 N.W.2d at 558 (emphasis in original). Here, Dr. Edward Nassif, a pediatrician, and Dr. Schafer both testified that limited visitation, handled sensitively, would provide much more benefit than harm. As Dr. Nassif observed, "I don't think … a child who has had such a traumatic thing happen to him so early in life can have too many people love him."

At trial the Nemers expressed an unqualified willingness to respect the Sweeneys' authority as Nathan's parents and to abide by any guidelines established by the court for visitation. Based on our review of the entire record, we cannot agree with the district court's conclusion that the Nemers' resumption of contact with their grandson will undermine the Sweeneys' parental authority or disrupt Nathan's loving relationship with his adoptive parents. To the contrary, we are persuaded that the visitation order entered in 1982 is not only legally enforceable but a viable method of insuring the best interest of this child.

We therefore reverse the judgment of the district court and remand the case for entry of an order enforcing the limited visitation schedule previously allowed in the first year of the guardianship so that the child may gradually renew his relationship with his grandparents.

REVERSED AND REMANDED WITH DIRECTIONS.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

When the guardian of the child became his adoptive parent, there was no longer any reason for continuing the guardianship. This circumstance serves to distinguish the present case from *In re Guardianship & Conservatorship of Ankeney*, 360 N.W.2d 733 (Iowa 1985), where there were property interests which served as a justification for continuing the guardianship and conservatorship. Because the *Sweeney* guardianship's reason for being has ceased, it is manifestly inappropriate to resort to that legal entity as a jurisdictional basis for continuing child custody and visitation orders.

I believe it is unwise for the court to search out other sources of legal authority for grandparent visitation rights. It is significant that the legislature has not seen fit to impose such relationships on adoptive parents in situations other than those involving stepparent adoptions. This is not such a case. I would affirm the judgment of the district court.