**Kurt McMAIN, Plaintiff,**

v.

**IOWA DISTRICT COURT FOR POLK COUNTY, Defendant.**

No. 96–06.

Supreme Court of Iowa.

Feb. 19, 1997.

Carmen L. Janssen, West Des Moines, and Catherine K. Levine, Des Moines, for plaintiff.

Daniel R. Marvin of Handley & Block, Ankeny, for defendant.

LARSON, Justice.

Kala McMain is a nine-year-old child whose life has been so traumatized by psychological problems and dysfunctional care givers that the probate court perceived a need for, and ordered, an extraordinary measure: visitation with her paternal grandparents despite the fact that the court had denied the grandparents' petition for their own appointment as guardians and despite the primary-care parent's objection to grandparent visitation. While we agree that Kala has special needs, grandparent visitation under the facts of this case lacks statutory or common-law support, and we therefore sustain the father's writ of certiorari.

## I. *The Facts.*

Kala's parents, Kurt and Sara McMain, were divorced in 1992. The parents were granted joint custody, and Kala's primary care was granted to Kurt. Kurt and Kala lived in the home of Kurt's parents, Randy and Sue McMain, for over two years, but eventually moved into their own home with Kurt's new wife, Sheila. At that time, the relationship between Kurt and his parents deteriorated.

Kala was a serious disciplinary problem in day-care centers, in school, and at home. She had been ejected from one day-care center and faced possible ejection from another. Kala's family sought help for her. In 1993 Kala began to see various professionals, including an art therapist, a clinical child psychologist, and a physician. Kala was exhibiting sexualized behavior, apparently stemming from sexual abuse inflicted by her natural mother's boyfriend, extreme anxiety, hyperactivity, and a general failure to thrive. Kala's condition was diagnosed by her psychologist and confirmed at the University of Iowa Hospitals as attention deficit hyperactivity disorder, oppositional defiant disorder, and a reactive attachment disorder.

Kala was described as demanding, destructive, argumentative, excitable, impulsive, easily distracted, and exhibiting frequent temper tantrums. One expert testified about the future problems for such a child:

Q. Would you predict that a child with that would grow up to be asocial or narcissistic? A. Very frequently social and often aggressively asocial such that they don't follow the usual moral expectations of the environment. It's get what they want and get out, essentially.

Q. Do those individuals end up with criminal records? A. They often can. They certainly can, unless something's happened to begin modifying allowing them to attach to someone.

Dr. Barbara Cavallin, a clinical child psychologist, testified concerning Kala's future needs:

Q. What's going to have to happen in order for her to achieve her full potential? A. She's going to have to be in a stable environment for a long period of time. She's going to need a high level of structure to show cause and effect and help her get control of her behavior. She's going to need to be able to feel safe at all times and feel as though she knows who's going to be with her and who's going to take care of her. She's going to need a lot of tender loving care, essentially.

Q. In your opinion, Dr. Cavallin, based again on your educational background and specific knowledge and experience with this case and working with Kurt and Sheila, I guess, what atmosphere would most

likely provide that in your opinion? A. Well, an atmosphere where the parent could be structured, could be available emotionally for the child, could follow through on a regular basis. I feel that Kurt and Sheila are providing that kind of environment.

The psychologist also stated:

She's bonding very well, surprisingly well with Sheila. As a matter of fact, now she's willing to eat full meals for Sheila, and she's been giving Sheila hugs and she misses her and she wants to check on her in the waiting room, so she's beginning to bond with Sheila quite nicely.

Ann Wellander, Kala's therapist, concurred regarding Sheila's performance as a care giver and regarding the need for strict discipline to alter Kala's behavior pattern. Both the psychologist and the therapist testified that the fact that Kurt was then residing in the Fort Des Moines OWI facility did not change their opinions that Kala was receiving good home care. (Kurt was due to be released from the OWI facility in October 1995.)

Prior to the initial hearing, Kala's behavior improved substantially, due in large part to the structured environment provided by Sheila in cooperation with the therapist and psychologist. Ritalin and Mellaril were effectively treating her hyperactivity and inability to sleep. Kala was bonding with Sheila and was beginning to thrive. However, the probate court noted in its final decision that Kala had regressed slightly during the pendency of the guardianship hearings (which were held in installments over approximately three months). A more structured environment in an inpatient treatment center appeared to be advisable as soon as an opening was available. Nevertheless, the prognosis for improvement in Kala's overall behavior seemed to be good.

Against this backdrop, these grandparents, Randy and Sue McMain, sought to have themselves appointed as guardians in the place of Kala's father and Sheila. While these grandparents obviously love Kala and have the best of intentions, they refuse to recognize the extent of Kala's psychological problems. They question whether she needs

the medication that has been prescribed for her. Even in the face of the recommendations of the treating professionals that strong discipline is necessary, these grandparents favor a passive approach to disciplining her.

The disciplining philosophy of the grandparents is illustrated by an incident that occurred while Kala and Kurt were living in the grandparents' home. Kala had been warned that if she misbehaved she could not go to the circus. She misbehaved, and Kurt attempted to follow through on his discipline. Kala's grandfather interceded and said Kala should be allowed to go to the circus. Further, if Kurt did not allow her to go, Kurt and Kala could just move out of the house. Kala went to the circus, and she misbehaved the whole time, according to her father.

We believe that the facts set out above demonstrate that forced visitation is not necessarily in Kala's best interest, especially in view of the need for .consistent and heavily structured treatment for her. More significant, however, is the fact that our law does not permit grandparent visitation in this case.

## II. *The Law in General.*

The mere fact that grandparents seek to force visitation through court action can be counterproductive in stabilizing a child's life. As the New York Court of Appeals has observed:

It is almost too obvious to state that, in cases where grandparents must use legal procedures to obtain visitation rights, some degree of animosity exists between them and the party having custody of the child or children. Were it otherwise, visitation could be achieved by agreement.

*Lo Presti v. Lo Presti,* 40 N.Y.2d 522, 387 N.Y.S.2d 412, 355 N.E.2d 372, 374 (1976).

Our own court has recognized the adverse effect of litigation to enforce visitation:

Courts that give a custodial parent veto power over grandparent visitation do so on the basis that judicial enforcement of visitation would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and

ill feelings between parent and grandparent, and coerce what should remain a moral rather than legal obligation.

*Olds v. Olds,* 356 N.W.2d 571, 573 (Iowa 1984). At common law, grandparents did not have the legal right of visitation over the objection of parents. *Id.* at 572; Annotation, *Grandparents' Visitation Rights,* 90 A.L.R.3d 222, 225 (1979).

█ We have, however, recognized the authority of a court to order grandparent visitation in certain closely circumscribed cases: (1) when it is authorized by statute, Iowa Code § 598.35 (1993); *e.g., see Olds,* 356 N.W.2d at 573; (2) when it is ordered in a guardianship in the best interests of the child, *In re Guardianship of Nemer,* 419 N.W.2d 582, 586 (Iowa 1988); *In re Guardianship of Ankeney,* 360 N.W.2d 733, 737 (Iowa 1985); and (3) when it is ordered by a juvenile court as a part of its dispositional or permanency hearing, *In re K.R.,* 537 N.W.2d 774, 777 (Iowa 1995).

### III. *The Law as Applied in This Case.*

As previously noted, the probate court refused these grandparents' petition to establish a guardianship and to appoint them as guardians. The court considered the relative strengths and weaknesses of the grandparents as compared to those of Kurt and Sheila and concluded that the grandparents had failed to overcome the presumption in favor of natural parents as guardians. The court's refusal to establish a guardianship is not an issue in this certiorari action. The issue is simply whether, on any of the three bases set out above, these grandparents are entitled to forced visitation.

First, this is not a juvenile case, so the authority of a juvenile court recognized in *In re K.R.,* 537 N.W.2d at 777, to order grandparent visitation is not applicable. And, as the probate court acknowledged, these grandparents do not qualify for visitation rights under our grandparent visitation statute, Iowa Code § 598.35, because they do not

meet any of the grounds set out in the statute.[1]

█ The court granted visitation to the grandparents solely on the ground that a court in a guardianship proceeding has such authority, citing *Ankeney* and *In re Guardianship of Stewart,* 369 N.W.2d 820 (Iowa 1985). *Ankeney,* however, made it clear that its holding was limited to guardianship proceedings in which the custodial parent, as guardian, was subject to the power of the guardianship court to enter orders in the best interests of the child, including an order for grandparent visitation. *Ankeney,* 360 N.W.2d at 737. As *Ankeney* stated, the ruling applied only to "the limited facts of this case." *Id.* at 735. The present case does not present such facts. The primary-care parent was not under the control of the guardianship court, and in fact the establishment of a guardianship had been denied.

The court also relied on *Stewart,* a case in which grandparent visitation was ordered by the probate court as a part of an order terminating the guardianship. *Stewart,* however, is not dispositive; grandparent visitation was not raised as an issue on that appeal.

Because the order lacked support under our cases or the grandparent visitation statute, Iowa Code § 598.35, we conclude that the court lacked authority to enter an order for visitation. Accordingly, we sustain the writ of certiorari.

WRIT SUSTAINED.

All Justices concur except SNELL and ANDREASEN, JJ., who dissent.

SNELL, Justice (dissenting).

I respectfully dissent.

This appeal presents only the question of the validity of the probate court's order permitting Kala, a seven-year-old, to have some contact with her grandparents. The issue of guardianship is not before us. The probate

---

1. Section 598.35 was amended in 1996 to allow an additional basis for grandparent visitation. However, this amendment was not effective as of the time of this hearing. In any event, even an expanded statutory ground for visitation would not be effective to grant visitation rights to grandparents who, as in this case, are the parents of the primary-care parent. *See Olds,* 356 N.W.2d at 574.

court ruled that custody of Kala should remain with her father as natural guardian. No appeal was taken from that decision. Visitation for Kala with her grandparents was approved by the court twice monthly for a period of three hours. I would affirm the probate court and annul the writ of certiorari.

This case originated with the filing of a petition by Sue and Randy McMain to establish an involuntary guardianship over their granddaughter, Kala McMain, age six and one-half. After several hearings on the question of guardianship, the probate court held that it was not established that a guardianship was in the best interests of the child.[2] The court also concluded, however, that it was in the child's best interests to have visitation rights established with the grandparents.

Unfortunately, Kala's father, Kurt, now objects to Kala's having any contact, through visitation, with his parents. At the time of hearing, Kurt was serving a five-year sentence for third-offense OWI. The court thought that in two or three months from the court's decision, Kurt would be released from the Fort Des Moines OWI facility. In fact, actual custody of Kala, as contrasted to legal custody, is in Kala's stepmother, who has no standing in this matter.

Our review proceeds under the provision of Iowa Rule of Civil Procedure 306. Relief by way of certiorari is strictly limited to questions of jurisdiction or illegality of the acts complained of, unless otherwise provided by statute. Iowa R.Civ.P. 308. Our review is at law, not de novo. *Zimmermann v. Iowa Dist. Ct.,* 480 N.W.2d 70, 74 (Iowa 1992). The factual findings are binding upon us if supported by substantial evidence. Iowa R.App.P. 14(f)(1).

The probate court found that Kala's parents were divorced and that her mother became unable to care for her where she lived in Illinois. Kurt and his parents then assumed the care of Kala at the grandparents' home in Altoona, Iowa. Kurt's mother, Sue McMain, became Kala's primary caretaker

for over two years. Upon Kurt's marriage to Sheila Ann Morris, he moved to another home, taking Kala with him. Although the relationship between Sheila and Kurt's parents was initially satisfactory, it deteriorated.

Testimony was adduced concerning Kala's behavior problems. She was diagnosed as having an attention-deficit hyperactivity disorder and oppositional defiant disorder, both categorized as severe, as well as reactive attachment disorder. The court expressed concern for the effect of removing Kala from Kurt's home. Kala had been taken from her mother's home at age three and from her grandparents' home at age five. Kala's stepmother then assumed primary care while Kurt served his sentence.

The probate court found that the grandparents tested normal and conventionally well adjusted in the psychological tests undertaken. Sheila, Kurt's wife, tested as someone who was assertive, dominant in close relationships, resentful of authority, resistive to external control, and scored low on the measure of social responsibility. She did appear, however, to have done well in caring for Kala and in dealing with her problems. Kurt scored low on measures of interpersonal dominance and social responsibility and was passive in nature.

Citing the preference that a parent has in a guardianship situation, the probate court held that the evidence was not sufficient to overcome the preference. *See* Iowa Code § 633.559 (1995). The court further concluded that Kala would benefit from visitation with her paternal grandparents with whom she had resided for over two years and during which time her grandmother, Sue, was her primary caretaker. Visitation with the grandparents was therefore provided in the court's order, twice monthly for a period of three hours.

Custody decisions include the determination of visitation rights. *In re K.R.,* 537 N.W.2d 774, 777 (Iowa 1995); *In re Marriage of Bolson,* 394 N.W.2d 361, 365 (Iowa 1986). The legislature has defined "custody

---

**2.** The record provides evidence and expert testimony from both parties in support of the court's granting custody to either the grandparents or the father. The probate court acknowledged this and then decided the parental preference was not overcome.

determination" as including an order for visitation rights. Iowa Code § 598A.2(2).

The district court, sitting in probate, has the power to start, administer, and close guardianships. *Id.* § 633.10(3). Guardianships are actions at law, while other matters are tried by the probate court in equity. *Id.* § 633.33. The district court, having jurisdiction of a guardianship, is the superior guardian, and the guardian is an officer of the court. *In re Guardianship of Ankeney,* 360 N.W.2d 733, 736 (Iowa 1985).

The power of the probate court is not limited to custody decisions. *Ankeney,* 360 N.W.2d at 737. In *Patten v. Patrick,* 276 N.W.2d 390, 397 (Iowa 1979), we established a child's grandmother as guardian and custodian and granted visitation rights to a natural parent. The authority of the probate court to grant access of the ward to a grandparent arises from the child's best interest rather than from a statutory or common law right possessed by the grandparent. *Ankeney,* 360 N.W.2d at 737. The one undisputed principle is that the best interest of the child is the supreme consideration. Iowa R.App.P. 14(f)(15).

Kurt argues that jurisdiction of the probate court is lost because the court failed to appoint his parents as guardian of Kala. He seeks to oust the court of jurisdiction on the issue of visitation based on what the court concluded from the guardianship issue, rather than on the fact that the court undeniably had jurisdiction in the first place.

> The test of whether a court has jurisdiction over a particular controversy depends upon the competency of the court to determine controversies of the general class to which the case presented for its consideration belongs, or whether the court has the power to enter upon the inquiry, not whether it might ultimately decide that it is unable to grant the relief sought in the particular case.

21 C.J.S. *Courts* § 18, at 24 (1990); *see also Commonwealth v. Court of Common Pleas,* 506 Pa. 410, 485 A.2d 755, 758 (1984).

A jurisdictional argument was made, and rejected, in *In re Guardianship of Nemer,* 419 N.W.2d 582 (Iowa 1988). There, the argument made was that the grandparent visitation rights were terminated when the child was adopted by a maternal aunt. *Id.* at 583. The trial court dismissed the grandparents' petition to enforce visitation rights, believing jurisdiction was lost because the parents' rights ended when the adoption occurred and the grandparents' rights were only derivative from the parents. *Id.* On appeal, our court reversed, holding that a valid adoption does not automatically terminate the guardianship or the authority of the probate court to ensure that the child's best interests are served. *Id.* at 584. We cited *Ankeney* with approval. In our analysis of the best interests of the child, we determined that visitation of the child with his grandparents was required. *Id.* at 585.

In *In re Guardianship of Stewart,* 369 N.W.2d 820 (Iowa 1985), a divorced father petitioned to terminate a guardianship in his daughter's maternal grandparents and transfer custody to himself. The trial court found that the father was now able to care for his daughter and that the parental preference in his favor was not overcome. *Id.* at 823. The trial court terminated the guardianship subject to the grandparents' right to exercise reasonable visitation, thus reestablishing custody of the child in her father. *Id.* at 822. On our de novo review, we affirmed. *Id.* We found that both the grandparents and the father were suitable custodians and would provide good homes for the child. *Id.* at 825. We then said: "On balance, however, we agree with the trial court that she should now live with her father. She will have the opportunity to maintain close contact with her extended family during regular periods of visitation with the Shepards." *Id.*

In the case at bar, the probate court cited *Ankeney* and *Stewart* as providing the authority and guides for its decision on visitation. The court noted that in *Stewart,* we affirmed the visitation provision that was provided by the trial court at the same time the guardianship in the grandparents was terminated, which gave custody to the natural father. *See id.* We affirmed the trial court without any reference to statutory provisions.

I believe there is no difference in legal theory or principle regarding jurisdiction between the *Stewart* case, where visitation rights were established by the court after termination of the guardianship, and the case at bar, where visitation rights were established by the court after deciding not to establish a guardianship in the grandparents. In both cases, the visitation provision was decided after the guardianship issue was decided, and was necessarily part and parcel of the guardianship hearing and the court's determination of the proper result. We said: "As in all child custody matters the first and governing consideration must be the best interest of the child." *Id.* at 824.

In *Ankeney,* grandparent visitation rights were determined after custody was established in the father. In *Nemer,* custody was in the child's aunt, through adoption, but the court, nevertheless, had jurisdiction to fix grandparent visitation rights. In *Stewart,* the father prevailed as natural guardian subject to visitation rights established by the trial court. In the case at bar, the probate court has established Kala's father as natural guardian entitled to custody, a matter unquestionably within the court's jurisdiction. As part of that decision, the court established limited visitation rights for Kala with her grandparents. Kurt's argument that the court loses all jurisdiction if it holds that Kurt is the child's guardian, as her father, but would have jurisdiction to determine visitation rights if the grandparents were appointed guardian is patently result-oriented and fails to follow the precedents of our cases.

In *Olds v. Olds,* 356 N.W.2d 571, 572 (Iowa 1984), we held that a grandparent does not possess a common law right to visitation with grandchildren. That result has been considerably muted by legislation in Iowa and across the country. All fifty states have now passed grandparent visitation statutes in one form or another. *See generally* Annotation, *Grandparents' Visitation Rights,* 90 A.L.R.3d 222 (1996). The Iowa legislature passed a statute authorizing grandparent visitation rights under numerous circumstances. *See* Iowa Code § 598.35.

In *Olds,* decided in 1984, we also held that the parents of a custodial parent were not included in the statute that permitted visitation by the children with their grandparents when the parents of the children are divorced. *Olds,* 356 N.W.2d at 573 (construing Iowa Code § 598.35(1) (1983)). Thus, the statute was construed to allow children visitation only with grandparents who were not the parents of the person having custody. *Id.* at 574. The rationale and the fear expressed in supporting this construction was that visitation for the children with the grandparents of the custodial parent would hamper parental authority. *Id.*

After *Olds,* we decided *Ankeney,* in which we said:

> The real issue is not a question of a grandparent's right to visitation; rather, this case concerns the authority of the district court sitting in probate to enter orders directing the guardian's actions in matters involving the best interest of the ward.
>
> . . . .
>
> The guardian's rights with respect to custody and control of the person of the infant extend to refusing to permit other persons to have access to the ward, but this power also is subject to the control of the court which may require the guardian to permit certain persons to have such access.
>
> If the best interest of the child dictates visitation, we hold that there is no logical reason to prevent visitation merely because the party seeking visitation is not entitled to it of right.

*Ankeney,* 360 N.W.2d at 736–37 (quoting 39 C.J.S. *Guardian and Ward* § 59, at 114 (1976)). The policy expressed as a legal principle in *Ankeney* clearly supports the probate court's decision in the case at bar.

Since 1984, the legislature has expanded the statutory circumstances for granting grandchild visitation with grandparents. Three more subsections have been added to Iowa Code section 598.35. The latest addition, in 1996, added subsection 7, authorizing the grandparent of a child to petition for grandchild visitation rights when "a parent of the child unreasonably refuses to allow visitation by the grandparent or unreasonably re-

stricts visitation." *See* 1996 Iowa Acts ch. 1041 (codified at Iowa Code § 598.35(7) (1997)). By this statute, the legislature has again signaled its approval of expanded visitation of a child with his or her grandparents.

Subsection 7 of the statute is not limited to a situation where the parents are divorced, as is subsection 1. Nor does it contain language eliminating its applicability to grandparents of a child who are the parents of the child's custodial parent, as we limited subsection 1 in *Olds*. Subsection 7 is not based on a death or divorce of the child's parents and does not therefore concern an issue of grandparent's rights being only derivative from either a custodial or noncustodial parent of the child.

Apart from the right to petition for a guardianship, as authorized by Iowa Code section 633.552, Sue and Randy McMain could at anytime, as provided by Iowa Code section 598.35, petition for the establishment of their grandchild's right to visit them. Although the case at bar did not proceed under section 598.35(1)(7), the probate court's finding that it was in Kala's best interest to visit her grandparents obviously embraced the belief that Kurt unreasonably refused to allow visitation.

In *Ankeney*, we recognized that it is appropriate and needed for a court to order visitation between a child and its grandparents when it is "in the child's best interests." *Ankeney*, 360 N.W.2d at 737. The legislature has stated its approval of a court's granting visitation rights to a child when the court finds that it is in the best interests of the child and the grandparent has established a substantial relationship with the child prior to the filing of the petition. *See* Iowa Code § 598.35.

In the case at bar, the probate court provided a modicum of visitation and concluded

> that Kala would benefit from visitation with her paternal grandparents since she did reside in their home for over two years during which time Sue, in particular, was her primary caretaker. She no doubt has missed them and it would appear to be in her best interest for her to have contact with her extended family.

The legislature and our cases have recognized the legal and practical merit in allowing a child to have meaningful contact with his or her grandparents through visitation. It may be that this is recognition of the fact that in a society of short-term marriages and latchkey kids, a stabilizing influence is provided by grandparents, who have no legal obligation to their grandchildren, but have only their best interests at heart.

I believe the probate court had jurisdiction to provide visitation between Kala and her grandparents. The findings of the court are supported by substantial evidence and should be affirmed. I would annul the writ of certiorari.

ANDREASEN, J., joins this dissent.